# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-1390


**BRETT OWEN BOURQUE**

**VERSUS**

**TRANSIT MIX/TRINITY IND.**

**********

ON REMAND FROM THE LOUISIANA SUPREME COURT

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT 4
PARISH OF LAFAYETTE, NO. 12-06201
ADAM JOHNSON, WORKERS' COMPENSATION JUDGE

**********

## JIMMIE C. PETERS
## JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.


**AFFIRMED.**


Ezell, J., concurs in the result without reasons.

**Karl W. Bengtson**
**Bengtson Law Firm, LLC**
**P.O. Drawer 51147-1147**
**Lafayette, LA 70505-1147**
**(337) 291-9119**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Brett Owen Bourque**

**Stephen E. Broyles**
**Glusman, Broyles & Glusman**
**P.O. Box 2711**
**Baton Rouge, LA 70821**
**(225) 387-5551**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Transit Mix Concrete & Materials Company**

**PETERS, J.**

We consider this workers' compensation matter on remand from the supreme court pursuant to its per curiam opinion granting the supervisory writ application of the defendant, Transit Mix Concrete & Materials Company (Transit Mix). *Bourque v. Transit Mix Concrete & Materials Co.*, 14-1588 (La. 12/8/14), 153 So.3d 419. The issues before us include the grant of a partial summary judgment in favor of Transit Mix and against the plaintiff, Brett Owen Bourque, limiting Transit Mix's liability for medical treatment received by Mr. Bourque to $750.00; and a subsequent judgment on the merits of that claim finding that the medical procedure at issue did not meet the requirements of the medical treatment schedule applicable to workers' compensation cases. This subsequent judgment had the effect of rendering the partial summary judgment moot. Still, Mr. Bourque has appealed both judgments, asserting two assignments of error. For the following reasons, we affirm the workers' compensation judge's judgments in all respects.

## DISCUSSION OF THE RECORD

On February 2, 1998, while employed as a truck driver by Transit Mix, Mr. Bourque suffered a work-related injury to his back. He received medical treatment for his injury and, ultimately, began treatment with Dr. Arnold Feldman, a Baton Rouge, Louisiana pain management physician,[1] and Dr. Donald D. Dietze, a Lacombe, Louisiana neurosurgeon. Dr. Dietze concluded that Mr. Bourque suffered from lumbosacral neuritis, facet arthropathy, lumbar disc with myelopathy, and anterior lumbar interbody fusion at L5-S1; and on June 14, 2011, recommended that Mr. Bourque undergo a repeat facet neurotomy/rhizotomy and

---

[1] Mr. Bourque first saw Dr. Feldman professionally on February 1, 2010.

intradiscal electrothermal treatment.[2] Dr. Feldman agreed with Dr. Dietze's assessment and, on August 16, 2011, recommended that Mr. Bourque first undergo a radio-frequency facet nerve ablation on the right side; and if that procedure produced pain relief, undergo the same procedure on the left side.

Six days later, on August 22, 2011, Dr. Feldman requested approval to perform the radio-frequency facet nerve ablation on Mr. Bourque's right side at L3-4, L4-5, and L5-S1. Transit Mix submitted the request pursuant to utilization review to Dr. Ira P. Posner, an orthopedic surgeon from Florida. Three days later, on August 25, 2011, Dr. Posner responded with a recommendation that the request not be certified.[3] This rejection was faxed to Dr. Feldman's office that same day. Despite Transit Mix's refusal to approve and pay for the procedure, Mr. Bourque followed the recommendation of his treating physicians, and on August 29, 2011, Dr. Feldman performed the surgery. When Transit Mix refused to reimburse him for the cost of the surgery, Mr. Bourque filed a disputed claim based on, among other issues, Transit Mix's failure to authorize the medical treatment recommended by Dr. Feldman and its refusal to reimburse him for the subsequent cost of the procedure. This filing occurred on September 11, 2012.

Transit Mix answered the disputed claim and subsequently filed the motion for partial summary judgment now before us. In its motion, Transit Mix sought to have Mr. Bourque's $10,786.12 claim for medical-cost reimbursement dismissed or, in the alternative, limited to $750.00 pursuant to La.R.S. 23:1142(B). Following an April 11, 2013 hearing on the summary judgment motion, the

---

[2] Mr. Bourque had responded favorably to that procedure in the past.

[3] As will be further discussed in the opinion, Dr. Posner did not reach the merits of the procedure, but found it not to be medically necessary or appropriate based on the incomplete nature of the request.

workers' compensation judge (WCJ) took the matter under advisement; and on April 22, 2013, the WCJ rendered oral reasons granting Transit Mix the alternative relief requested by limiting its liability for the nerve procedure to $750.00. The WCJ executed a judgment to this effect on May 14, 2013.

After the WCJ rendered its oral reasons for judgment, but before it executed the May 14, 2013 judgment, the WCJ heard the matter on the merits. This trial occurred on May 9, 2013, with the WCJ again taking the matter under advisement after completion of the evidence.[4] On July 1, 2013, the WCJ rendered oral reasons for judgment finding that the nerve procedure performed by Dr. Feldman "was not in accordance with the medical treatment guidelines[,]" and dismissed Mr. Bourque's claims for benefits against Transit Mix on that issue.[5] The WCJ executed a judgment to this effect on July 10, 2013.

In his appeal, Mr. Bourque asserted that he was appealing both the partial summary judgment as well as the judgment on the merits. To that end, he raised two assignments of error:

1. The Trial Court erred in failing to approve the full reimbursement of medical expenses despite claimant's request for review of "already performed" treatment pursuant [to] RS 23:1291 (B)(10) and the director's failure to consider the request.

2. The Trial Court erred in failing to require defendant to sustain its motion for summary judgment by establishing that there was no factual issue that it had complied with RS 23:1203 E and with LAC 40 § 2751 E-1.

---

[4] The matter was submitted on stipulations, exhibits, and briefs.

[5] Based upon a stipulation, the WCJ awarded Mr. Bourque a judgment for penalties and attorney fees associated with certain travel expenses.

3

**OPINION**

In our prior opinion, we remanded the matter to the Office of Workers' Compensation for further proceedings based on our finding that Transit Mix failed to properly introduce its exhibits into the record in support of its motion for partial summary judgment. However, the supreme court concluded that Transit Mix's evidence was properly admitted because: (1) the "technical rules of evidence and procedure are relaxed" in workers' compensation cases; (2) the recent amendments to La.Code Civ.P. art. 966(F)(2) provide that exhibits attached to the motion are considered admitted absent an objection; and (3) Mr. Bourque did not object to the exhibits at the hearing on the summary judgment.[6] *Bourque*, 153 So.3d at 420. Considering the remand and the supreme court's instructions, we will now review both of Mr. Bourque's assignments of error.

It is well settled that "[a]ppellate review of the granting of a motion for summary judgment is *de novo*, using the identical criteria that govern the trial court's consideration of whether summary judgment is appropriate." *Smitko v. Gulf S. Shrimp, Inc.*, 11-2566, p. 7 (La. 7/2/12), 94 So.3d 750, 755. Summary judgment proceedings are "favored" and "designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969." La.Code Civ.P. art. 966(A)(2). It is equally well settled that we review the factual findings of the WCJ in a trial on the merits pursuant to the manifest error standard of review. *Vital v. Landmark of Lake Charles*, 14-96 (La.App. 3 Cir. 6/4/14), 140 So.3d 860, *writ denied*, 14-1430 (La. 10/3/14), 149 So.3d 802.

Considering the evidence supporting the motion for partial summary judgment properly admitted by Transit Mix, we first turn to the question of

---

[6] The judgment was rendered by a divided court in that three of the justices dissented in the grant of the supervisory writ and order of remand.

4

whether Transit Mix was entitled to the partial summary judgment limiting its liability for the procedure performed by Dr. Feldman to $750.00.

Louisiana Revised Statutes 23:1203(A) provides, in pertinent part:

In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services.

It is not disputed that the procedure performed by Dr. Feldman was nonemergency in nature and, with regard to the payment for nonemergency care, La.R.S. 23:1142 provides in pertinent part:

**B. Nonemergency care.** (1)(a) Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor and the employee as provided by regulation. Except as provided herein, that portion of the fees for nonemergency services of each health care provider in excess of seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer's workers' compensation insurer unless the employee and the payor have agreed upon the diagnostic testing or treatment by the health care provider.

(b)(i) the payor may contract with a utilization review company to assist the payor in determining if the request for nonemergency diagnostic testing or treatment, in an amount which exceeds seven hundred fifty dollars, is a medical necessity as provided pursuant to this Chapter.

(ii) A medical necessity determination by a utilization review company and the payor's consent to authorize the requested nonemergency diagnostic testing and treatment shall require only a review of the claimant's medical records and shall not require an examination of the employee.

(2)(a) When the payor has agreed to the diagnostic testing or treatment, the health care provider shall not issue any demand for payment to the employee or his family until the payor denies liability for the diagnostic testing or treatment. Notwithstanding the foregoing, the health care provider may reasonably communicate with the employee or his attorney or representative for the purpose of pursuing its claim against the payor.

(b)   A health care provider who knowingly and willfully violates this Paragraph may be ordered by the workers' compensation judge to pay penalties not to exceed two hundred fifty dollars per violation plus reasonable attorney fees.  The penalty shall not exceed one thousand dollars for any demand for payment to an employee or his family which is issued after the health care provider has been penalized for a previous demand for payment to that employee or his family.

. . . .

**D.  Fees and expenses.**  If the payor has not consented to the request to incur more than a total of seven hundred fifty dollars for any and all nonemergency diagnostic testing or treatment when such consent is required by this Section, and it is determined by a court having jurisdiction in an action brought either by the employee or the health care provider that the withholding of such consent was arbitrary and capricious, or without probable cause, the employer or the insurer shall be liable to the employee or health care provider bringing the action for reasonable attorney fees related to this dispute and to the employee for any medical expenses so incurred by him for an aggravation of the employee's condition resulting from the withholding of such health care provider services.

**E.  Exception.**  In the event that the payor has denied that the employee's injury is compensable under this Chapter, then no approval from the payor is required prior to the provision of any diagnostic testing or treatment for that injury.

When an employee or health care provider first requests approval for nonemergency diagnostic testing or treatment exceeding $750.00, the employer or compensation insurer has an obligation to provide the employee with specific information regarding his or her rights and the procedure associated with the protection of those rights.

Upon the first request for authorization pursuant to R.S. 23:1142(B)(1), for a claimant's medical care, service, or treatment, the payor, as defined in R.S. 23:1142(A)(1), shall communicate to the claimant information, in plain language, regarding the procedure for requesting an independent medical examination in the event a dispute arises as to the condition of the employee or the employee's capacity to work, and the procedure for appealing the denial of medical treatment to the medical director as provided in R.S. 23:1203.1.  A payor shall not deny medical care, service, or treatment to a claimant unless the payor can document a reasonable and diligent effort in communicating such information.  A payor who denies medical care,

6

service, or treatment without making such an effort may be fined an amount not to exceed five hundred dollars or the cost of the medical care, service, or treatment, whichever is more.

La.R.S. 23:1203(E).

Louisiana Revised Statutes 23:1291(B)(10) provides that the director of the Office of Workers' Compensation Administration (OWCA) (hereinafter referred to simply as "the director") has the power and duty:

> To require the use of appropriate procedures, including a utilization review process that establishes standards of review, for determining the necessity, advisability, and cost of proposed or already performed hospital care or services, medical or surgical treatment, or any nonmedical treatment recognized by the laws of this state as legal, and to resolve disputes over the necessity, advisability and cost of same.

To accomplish that goal, the director has the power "[t]o engage the services of qualified experts in the appropriate health-care fields to assist him in the discharge of his responsibilities in Paragraph (10) of this Subsection, and to establish fees and promulgate rules and procedures in furtherance of his performance of these duties." La.R.S. 23:1291(B)(11).

The reference to La.R.S. 23:1203.1 in La.R.S. 23:1203(E) is a reference to the authority of the director to create a medical advisory council (La.R.S. 23:1203.1(F)) and to establish and promulgate a medical treatment schedule for use in workers' compensation matters (La.R.S. 23:1203.1(B)). The scope and application of the medical treatment schedule is set forth in La.R.S. 23:1203.1(I) (emphasis added), which provides:

> After the promulgation of the medical treatment schedule, throughout this Chapter, and notwithstanding any provision of law to the contrary, *medical care, services, and treatment due, pursuant to R.S. 23:1203, et seq., by the employer to the employee shall mean care, services, and treatment in accordance with the medical treatment schedule.* Medical care, services, and treatment that varies from the promulgated medical treatment schedule shall also be due by the employer when it is demonstrated to the medical director of the

office by a preponderance of the scientific medical evidence, that a variance from the medical treatment schedule is reasonably required to cure or relieve the injured worker from the effects of the injury or occupational disease given the circumstances.

Any party disagreeing with the decision of the medical director or associate medical director concerning medical care, services, or treatment of an injured employee may appeal that decision to the OWCA by filing a Form 1008 "Disputed Claim for Compensation." La.R.S. 23:1203.1(K). However, while the medical director or associated medical director reviews the request of the treating physician for medical care, services, or treatment under a legal "preponderance of the scientific medical evidence" standard as provided for in La.R.S. 23:1203.1(I), the WCJ reviews the decision of the medical director or associate medical director under a "clear and convincing evidence" standard. La.R.S. 23:1203.1(K). Thus, the finding of the medical director is entitled to more weight than that of the treating physician.

The medical treatment schedule was promulgated in June of 2011, and therefore, was in effect at the time of both the summary judgment hearing and the trial on the merits. La.Admin.Code tit. 40:1, § 2013. The procedure now in place to resolve any medical treatment disputes between the employee and the employer/compensation insurer is set forth in La.R.S. 23:1203.1(J)(1), which provides:

> After a medical provider has submitted to the payor the request for authorization and the information required by the Louisiana Administrative Code, Title 40, Chapter 27, the payor shall notify the medical provider of their action on the request within five business days of receipt of the request. If any dispute arises after January 1, 2011, as to whether the recommended care, services, or treatment is in accordance with the medical treatment schedule, or whether a variance from the medical treatment schedule is reasonably required as contemplated in Subsection I of this Section, any aggrieved party shall file, within fifteen calendar days, an appeal with the office of workers' compensation administration medical director or associate

8

medical director on a form promulgated by the director. The medical director or associate medical director shall render a decision as soon as is practicable, but in no event, not more than thirty calendar days from the date of filing.

Although Mr. Bourque's work-related injury occurred prior to the implementation of the medical treatment schedule, the supreme court has held that La.R.S. 23:1203.1 is procedural in nature and applicable to all medical-treatment requests subsequent to January 1, 2011, even though the injury in question occurred prior to that date. *Church Mut. Ins. Co. v. Dardar*, 13-2351 (La. 5/7/14), 145 So.3d 271; *Cook v. Family Care Servs., Inc.*, 13-2326, 13-2351 (La. 5/7/14), 144 So.3d 969. Accordingly, the medical treatment schedule applies to Mr. Bourque's August 22, 2011 request for the radio-frequency nerve ablation procedure, even though his work-related accident occurred in 1998.

In the matter before us, Transit Mix does not deny that Mr. Bourque sustained a compensable injury. Also, there exists no dispute concerning the time frame of the pertinent events. Dr. Feldman sought authority to perform the recommended, nonemergency treatment on August 22, 2011; Transit Mix referred the issue to utilization review by authority of La.R.S. 23:1142(B)(b)(i); three days after Dr. Feldman's request for approval, the utilization review physician informed Transit Mix's compensation insurer that in his opinion, the procedure was not medically necessary or appropriate; and on that same day, Transit Mix's compensation insurer notified Dr. Feldman in writing that it would not authorize the procedure. Thus, the request and rejection activity took place within the time limitations set forth in La.R.S. 23:1203.1(J)(1).

However, neither Dr. Feldman[7] nor Mr. Bourque timely sought an appeal with the OWCA medical director or associate medical director within the fifteen-day delay set forth in La.R.S. 23:1203.1(J)(1). Instead, sometime in early 2013, Mr. Bourque attempted to have the medical director rule on the issue, and this attempt was rejected by the medical director.[8]

Based on the foregoing, in August of 2011, when Mr. Bourque requested approval and reimbursement for the medical treatment recommended, La.R.S. 23:1203.1 required that this treatment be in accordance with the medical treatment schedule and that disputes over the recommended treatment must first be resolved by the medical director before the treatment could be provided. Additionally, La.R.S. 23:1142(B) requires the mutual consent of the employer and the employee before a medical provider can provide an injured employee nonemergency medical treatment costing in excess of $750.00. Absent that consent, the medical care provider's recovery for services rendered is limited to $750.00. *Id.*

The undisputed facts before the WCJ were that Transit Mix never acquiesced in the provision of the medical treatment provided by Dr. Feldman. Mr. Bourque argues, however, that La.R.S. 23:1291(B)(10) (emphasis added) requires the director "[t]o require the use of appropriate procedures . . . for determining the

---

[7] Louisiana Revised Statutes 23:1203.1(J)(1) establishes a procedure whereby "any aggrieved party" may file an appeal of the medical director's decision. Additionally, La.R.S. 23:1142(B) seems to address a dispute that may arise between the health care provider and the employer/compensation insurer as it provides penalties that may be imposed against the health care provider. Therefore, the treating physician whose request has been denied would seem to fit within the category of "any aggrieved party."

[8] While no evidence was introduced on the time-line for this attempt at having the medical director review the rejection of the procedure, the parties stipulated at the trial of the partial summary judgment motion that such an effort did take place. Mr. Bourque asserts on appeal that the medical director refused to review the procedure after it had been performed by Dr. Feldman, and therefore, never reached the merits of whether the procedure was medically necessary. However, the stipulation did not address that issue, and no evidence exists to consider this assertion.

10

necessity, advisability, and cost of proposed or *already performed . . .* surgical treatment[,]" and no such procedure exists. That being the case, he argues, he was not required to delay his surgery for the current utilization process to run its course.

We find no merit in this argument. While La.R.S. 23:1291(B)(10) sets forth the director's very broad authority in administering the OWCA, that broad authority is redefined in the more specific statutes such as La.R.S. 23:1142. In fact, La.R.S. 23:1142(B) and (C) draw distinctions between nonemergency care and emergency care. In the former, the cost of medical care must be agreed upon or preapproved to avoid the $750.00 limitation, while in the latter, prior consent for emergency care is not required. Thus, we find no error in the WCJ's grant of the partial summary judgment.

We now turn to the consideration of the WCJ's judgment rendered after the trial on the merits. After taking the matter under advisement, the WCJ rendered the following oral reasons for judgment:

> Considering the law and the evidence, the totality of the evidence including but not limited to Dr. Posner's deposition and the medical treatment guidelines, the radio frequency ablation performed by Dr. Feldman was not in accordance with the medical treatment guidelines. Accordingly, the matter is dismissed with prejudice.

The medical treatment guidelines provide guidelines for both operative and non-operative therapeutic procedures. In La.Admin.Code tit. 40:I, § 2113(A)(5), relative to therapeutic operative procedures for the treatment of chronic pain disorders, the medical treatment guidelines provide, in part:

> When considering operative intervention in chronic pain management, the treating physician must carefully consider the inherent risk and benefit of the procedure. All operative intervention should be based on a positive correlation with clinical findings, the clinical course, and diagnostic tests. A comprehensive assessment of these factors should have led to a specific diagnosis with positive identification of the pathologic condition.

11

. . . .

5. Facet Rhizotomy

a. Description - A procedure designed to denervate the facet joint by ablating the periarticular facet nerve branches. There is good evidence to support this procedure for the cervical spine and some evidence in lumbar spine but benefits beyond one year are not yet established. Therefore, the patient should be committed to active therapy during the first post-surgical year.

b. Complications - Bleeding, infection, neural injury. There is a risk of developing a deafferentation centralized pain syndrome as a complication of this and other neuroablative procedures.

c. Surgical Indications - Pain of well-documented facet origin, unresponsive to active and/or passive therapy, unresponsive to manual therapy, and in whom a psychosocial evaluation has been performed. This procedure is commonly used to provide a window of pain relief allowing for participation in active therapy. All patients must have a successful response to diagnostic medial nerve branch blocks. A successful response is considered to be a 50 percent or greater relief of pain for the length of time appropriate to the local anesthetic used (i.e., bupivacaine greater than lidocaine).

d. Contraindications - Failure to obtain 50 percent or greater relief of pain with diagnostic medial branch block as well as bacterial infection - systemic or localized to region of implantation, bleeding diatheses, hematological conditions, and possible pregnancy.

In La.Admin.Code tit. 40:I, § 2021(H)(3)(f), relative to non-operative procedures

for the treatment of lower back pain, the medical guidelines provide, in part:

Radio Frequency Medial Branch Neurotomy/Facet Rhizotomy

i. Description—a procedure designed to denervate the facet joint by ablating the corresponding sensory medial branches. Continuous percutaneous radiofrequency is the method generally used. There is good evidence to support Radio Frequency Medial Branch Neurotomy in the cervical spine but benefits beyond one year are not yet established. Evidence in the lumbar spine is conflicting; however, the procedure is generally accepted. In one study, 60 percent of patients maintained at least 90 percent pain relief at 12 months. Radio-frequency Medial Branch Neurotomy is the procedure of choice over alcohol, phenol, or cryoablation. Precise positioning of the probe using fluoroscopic guidance is required since the maximum effective diameter of the device is a 5x8 millimeter oval. Permanent images should be recorded to verify placement of the device.

ii. Indications—those patients with proven, significant, facetogenic pain. A minority of low back patients would be expected to qualify for this procedure. This procedure is not recommended for patients with multiple pain generators or involvement of more than 3 levels of medial branch nerves.

(a). Individuals should have met all of the following indications: Pain of well-documented facet origin, unresponsive to active and/or passive therapy,; unresponsive to manual therapy, and in which a psychosocial screening has been performed (e.g., pain diagram, Waddell's signs, thorough psychosocial history, screening questionnaire). It is generally recommended that this procedure not be performed until three months of active therapy and manual therapy have been completed. All patients should continue appropriate exercise with functionally directed rehabilitation. Active treatment, which patients will have had prior to the procedure, will frequently require a repeat of the sessions previously ordered (Refer to Active Therapy.)

(b). All patients should have a successful response to a diagnostic medial nerve branch block and a separate comparative block. ISIS suggests controlled blocks using either placebo or anesthetics with varying lengths of activity (i.e., bupivacaine longer than lidocaine). To be a positive diagnostic block

13

the patient should report a reduction of pain of 50 percent or greater from baseline for the length of time appropriate for the local anesthetic used. In almost all cases this will mean a reduction of pain to one or two on the VAS 10-point scale correlated with functional improvement. The patient should also identify activities of daily living (which may include measurements of range of motion) that are impeded by their pain and can be observed to document functional improvement in the clinical setting. Ideally, these activities should be assessed throughout the observation period for function. The observer should not be the physician who performed the procedure. It is suggested that this be recorded on a form similar to ISIS recommendations.

(c). A separate comparative block on a different date may be performed to confirm the level of involvement. A comparative block uses anesthetics with varying lengths of activity.

. . . .

v. Requirements for Repeat Radiofrequency Medial Branch Neurotomy (or additional-level RF Neurotomies): In some cases pain may recur. Successful RF Neurotomy usually provides from six to eighteen months of relief.

(a). Before a repeat RF Neurotomy is done, a confirmatory medial branch injection should be performed if the patient's pain pattern presents differently than the initial evaluation. In occasional patients, additional levels of RF neurotomy may be necessary. The same indications and limitations apply.

Pursuant to the guidelines for the treatment of lower back pain and chronic pain, the patient must meet the listed criteria for the proposed treatment to be considered medically necessary before the nerve ablation/rhizotomy will be performed. The patient must have (1) pain of well-documented facet origin, unresponsive to active and/or passive therapy, (2) unresponsive to manual therapy,

14

and (3) in which psychosocial screening has been performed. Further, with regard to chronic pain treatment, the patient "must have a successful response to diagnostic medial nerve branch blocks." La.Admin.Code tit. 40:I, § 2113(A)(5). For the non-operative treatment of lower-back pain, the patient "should have a successful response to a diagnostic medial nerve branch block and a separate comparative block." La.Admin.Code tit. 40:I, 2021(H)(3)(f)(ii)(b). Medial nerve branch blocks are described as being diagnostic in nature and are "used to determine whether a patient is a candidate for radiofrequency medial branch neurotomy (also known as facet rhizotomy)." La.Admin.Code tit. 40:I, § 2019(C)(2)(b)(vi)(a), § 2109(A)(5)(v)(a).

The parties stipulated at trial that if called as a witness, Mr. Bourque would testify that he received relief from the radio-frequency facet nerve ablation performed by Dr. Feldman on August 29, 2011. Additionally, testimony was provided to the WCJ by the deposition of Dr. Posner, which was one of the exhibits offered into evidence.

Dr. Posner testified that he did not reach the merits of Dr. Feldman's request because that request did not contain sufficient information for him to determine that the medical procedure was medically necessary or appropriate. He described the procedure recommended by Dr. Feldman as the burning of a facet-joint nerve and stated that the necessity for this procedure is established through a diagnostic block pin-pointing the nerve that is the pain generator for the patient's low-back pain. According to Dr. Posner, the procedure destroys the sensory input received by the spinal cord and the brain from that facet joint, and the patient receives up to nine months of pain relief. The specific defect in Dr. Feldman's request, according to Dr. Posner, was the failure of the request to assert that Mr. Bourque had

undergone the diagnostic facet-joint blocks before the radio-frequency facet nerve ablation procedure. According to Dr. Posner, the medical records available to him contained no indication that such a procedure had been performed before Dr. Feldman submitted his request for approval of the radio-frequency facet nerve ablation or had been performed after the submission or prior to the August 29, 2011 surgery.

The doctor suggested that only if the patient underwent facet-joint blocks and experienced a fifty percent improvement in his pain symptoms over a period of up to two weeks, would a nerve ablation be considered medically necessary. Additionally, according to Dr. Posner, the facet block, itself, can be therapeutic, and he has had some patients who received permanent and long-term relief from the nerve block, thereby precluding the necessity for the nerve ablation procedure. Dr. Posner did acknowledge, however, that the nerve block does nothing to prepare a patient for a nerve-ablation procedure and that an ablation can provide a patient relief without a patient first enduring a nerve-block procedure. Despite the fact that Mr. Bourque's condition improved after the ablation, Dr. Posner was still of the opinion that the procedure was not medically necessary because Dr. Feldman failed to follow the medical guidelines.

Dr. Posner also asserted that no medical rationale existed to support Dr. Feldman's request to perform a nerve ablation at L5-S1, since that level had previously been fused. Acknowledging that some patients will experience pain at the L5-S1 level subsequent to a fusion, Mr. Bourque's medical records provided no documentation of such complaints. Additionally, according to Dr. Posner, the medical treatment guidelines require a psychological evaluation of the patient

before performance of a nerve-ablation procedure, and there exists no evidence of such an evaluation in Mr. Bourque's records.

Medical necessity is defined by La.Admin.Code tit. 40:I, § 2717(C)(3) as follows:

> a.   The workers' compensation law provides benefits for services that are medically necessary for the diagnosis or treatment of a claimant's work related illness, injury, symptom or complaint. *Medically necessary* or *medical necessity* shall mean health care services that are:
>
>> i.      clinically appropriate, in terms of type, frequency, extent, site, and duration, and effective for the patient's illness, injury, or disease; and
>>
>> ii.     in accordance with the medical treatment schedule and the provisions of R.S. 23:1203.1.
>
> b.   To be medically necessary, a service must be:
>
>> i.      consistent with the diagnosis and treatment of a condition or complaint; and
>>
>> ii.     in accordance with the Louisiana medical treatment schedule; and
>>
>> iii.    not solely for the convenience of the patient, family, hospital or physician; and
>>
>> iv.     furnished in the most appropriate and least intensive type of medical care setting required by the patient's condition.

Thus, for workers' compensation purposes, a treatment of an injured worker can be appropriate and effective, but will not be considered medically necessary unless it is also in accordance with the medical treatment schedule.

The evidence establishes that Dr. Posner initially recommended to Transit Mix that Dr. Feldman's request be rejected because the submittal by Dr. Feldman was defective in that it did not mention the results of any diagnostic medial nerve branch blocks; and that later it was determined that the nerve blocks were not mentioned because they had not occurred. Additionally, while acknowledging that

17

a patient can receive relief from radio-frequency facet nerve ablation absent any diagnostic nerve-branch blocks being performed (and Mr. Bourque did receive such relief), he testified that he still would have rejected the request because it did not meet the criteria of the medical treatment guidelines.

In its reasons for judgment, the WCJ did not discuss the fact that Mr. Bourque received relief from his pain because of the radio frequency ablation procedure performed by Dr. Feldman. Instead, without referring specifically to La.Admin.Code tit. 40:I, § 2717(C)(3)(a)(ii), and without using the term "medically necessary," the WCJ concluded that Mr. Bourque was not entitled to relief because the procedure performed by Dr. Feldman "was not in accordance with the medical treatment guidelines." Thus, we have before us a situation where an injured employee received relief from a procedure performed by his treating physician, but was denied reimbursement for the cost of that procedure because his physician's treatment did not meet the technical aspects of the medical treatment guidelines currently in place.

Still, we cannot ignore the mandate of La.R.S. 23:1203.1(I) (emphasis added) that "medical care, services, and treatment due, pursuant to R.S. 23:1203, et seq., by the employer to the employee *shall* mean care, services, and treatment in accordance with the medical treatment schedule." Dr. Feldman did not comply with the medical treatment schedule, and neither Dr. Feldman nor Mr. Bourque timely sought review of the employer's rejection of the procedure with the medical director or associate medical director as provided for in La.R.S. 23:1203.1(J)(1). Applying the statutory scheme associated with the medical treatment schedule, we must find no merit in Mr. Bourque's argument that the WCJ erred in dismissing his claims after the trial on the merits.

18

## DISPOSITION

For the foregoing reasons, we affirm both judgments of the workers' compensation judge addressed in this appeal. We assess all costs of this appeal to the plaintiff, Brett Owen Bourque.

**AFFIRMED.**