# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-621


BONNIE CONNER

VERSUS

BRIDGEFIELD CASUALTY INSURANCE COMPANY, ET AL.


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - DISTRICT 3
PARISH OF CALCASIEU, NO. 11-09743
CHARLOTTE L. BUSHNELL, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Marc T. Amy, Judges.


AFFIRMED AS AMENDED AND RENDERED.

Michael B. Miller
Jacqueline B. Manecke
Miller & Associates
P. O. Drawer 1630
Crowley, LA 70527-1630
(337) 785-9500
COUNSEL FOR PLAINTIFF/APPELLEE:
    Bonnie Conner

**Matthew W. Tierney**
**Tierney and Smiley, LLC**
**3535 S. Sherwood Forest Boulevard, Suite 233**
**Baton Rouge, LA 70816**
**(225) 298-0770**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Jennings American Legion Hospital**
    **Bridgefield Casualty Insurance Company**

**PETERS, Judge.**

The defendants in this workers' compensation matter are Jennings American Legion Hospital (Jennings Hospital) and its workers' compensation insurer, Bridgefield Casualty Insurance Company (Bridgefield Insurance).[1] They appeal the judgment of the workers' compensation judge (WCJ) awarding the plaintiff, Bonnie Conner, workers' compensation benefits, penalties, attorney fees, and expenses associated with a September 4, 2010 accident. For the following reasons, we amend the WCJ judgment to decrease the expenses awarded to Ms. Conner from $2,247.25 to $419.26; affirm the judgment as amended; and render judgment awarding Ms. Conner $5,000.00 in attorney fees for work performed by her counsel on appeal.

## DISCUSSION OF THE RECORD

On Saturday, September 4, 2010, Ms. Conner slipped on a wet floor while mopping an operating room. She immediately felt pain in her left leg from the thigh to the knee, immediately reported the accident, and was provided immediate medical attention by Jennings Hospital. The initial diagnosis was that Ms. Conner sustained a strained left hamstring. However, when her symptoms persisted, she was seen by Dr. Michael R. Holland, a Jennings, Louisiana orthopedic surgeon, who subsequently performed a left total knee replacement. Thereafter, when Ms. Conner later related her back and right knee pain to the accident, he refused to treat her for those complaints on the basis that they were not related to the initial injury. Finding that Ms. Conner had reached maximum medical improvement (MMI) for the left knee injury, Dr. Holland discharged her as a patient on March 22, 2012. At

---

[1] In some documents in the appeal record, Jennings Hospital's workers' compensation insurer is identified as "Summit." However, other documents suggest that Bridgefield Insurance is a Summit affiliate. Therefore, we will refer to the hospital's compensation insurer as Bridgefield Casualty Insurance Company or Bridgefield Insurance.

the time he discharged her from his care, he was of the opinion that she was capable of returning to work, but only in a sedentary capacity.

Ms. Conner then came under the care of Dr. Louis Blanda, a Lafayette, Louisiana orthopedic surgeon. Dr. Blanda concluded that Ms. Conner's back and right knee pain was caused by the accident of September 4, 2010, but Bridgefield Insurance initially limited his treatment authorization to her left knee. In June of 2012, Dr. Blanda concluded that Ms. Conner had reached MMI for the left knee, but that the knee replacement procedure resulted in a fifty percent impairment of the left leg. This impairment by itself, according to Dr. Blanda, limited Ms. Conner to sedentary work.

Dr. Blanda ultimately received authorization to evaluate and treat Ms. Conner's back and right knee complaints. X-rays of the right knee taken pursuant to that authorization, revealed a moderate degree of arthritic change in her knee's three compartments; x-rays of her lower back demonstrated diffuse degenerative changes, but no focal abnormalities. Dr. Blanda drained Ms. Conner's right knee and injected it with a steroid. At the time of trial, he had yet to obtain authorization for a lumbar MRI.

Jennings Hospital and Bridgefield Insurance (sometimes collectively referred to as "the defendants") initially paid weekly compensation benefits to Ms. Conner and paid for her medical treatment through Dr. Holland's discharge of her as a patient. However, once it became clear that the defendants were not going to recognize her back and right knee complaints as compensable, Ms. Conner filed a disputed claim for compensation asserting that they failed to authorize treatment by her choice of orthopedic surgeon; and for that failure, she sought penalties and attorney fees, together with legal interest on all amounts due. The defendants

2

answered the claim, arguing that they had provided Ms. Conner with all of the workers' compensation benefits she was entitled to by law.

Subsequently, Ms. Conner filed a motion for partial summary judgment, seeking recognition that she suffered injuries to both knees and her lower back as a result of her September 4, 2010 work-related accident; and that she was entitled to $8,000.00 in penalties pursuant to La.R.S. 23:1201(F) and an award of attorney fees. The WCJ rendered a summary judgment finding that Ms. Conner sustained an injury while in the course and scope of her employment with Jennings Hospital on September 4, 2010, but denied summary judgment relief on the issues of causation, penalties, and attorney fees.

At the beginning of the trial on the merits, Jennings Hospital acknowledged its employer status; Bridgefield Insurance acknowledged its status as Jennings Hospital's workers' compensation insurer; and Ms. Conner acknowledged that she had received weekly compensation benefits at the rate of $204.83 per week since the accident. Upon completion of the evidentiary phase of the trial, the WCJ took the matter under advisement. On April 6, 2015, the WCJ rendered both a written judgment and written reasons for judgment, finding that Ms. Conner was entitled to supplemental earnings benefits (SEBs) calculated at zero earnings; her lower back and right knee complaints were causally related to her September 4, 2010 work-related accident; and she was entitled to $8,000.00 in penalties based on the defendants' failure to timely reimburse her mileage on four separate occasions. The WCJ also awarded Ms. Conner $22,925.00 in attorney fees and $2,247.25 in expenses.

The defendants perfected this appeal from the judgment, raising three assignments of error:

1. The trial court was manifestly erroneous in finding that the Appellee's back condition and right knee are causally related to the work accident and compensable;

2. The trial court abused its discretion in awarding excessive attorney fees and costs; and

3. The trial court erred in relying on improper evidence and refusing to allow counsel to question opposing counsel as to attorney fee submission.

Ms. Conner answered the defendants' appeal, arguing that the WCJ legally erred by not awarding her legal interest on all amounts awarded by the judgment. She further requested additional attorney fees for work performed by her counsel in defending this appeal.

## OPINION

It is well settled that the factual findings of a WCJ are reviewed pursuant to the manifest error standard of review. *Bourque v. Transit Mix/Trinity Ind.*, 13-1390 (La.App. 3 Cir. 4/1/15), 162 So.3d 690.

In *Tate v. Cabot Corp.*, 01-1652, pp. 5-6 (La.App. 3 Cir. 7/3/02), 824 So.2d 456, 461 (alteration in original), *writ denied*, 02-2150 (La. 11/22/02), 829 So.2d 1044, as recently quoted in *Turner v. Lexington House*, 14-1264, p. 5-6 (La.App. 3 Cir. 4/15/15), __ So.3d __, __, *writ denied*, 15-952 (La. 8/28/15), __ So.3d __, this court stated:

Because an employer takes his employee as he finds him, a preexisting condition does not prevent recovery through workers' compensation. *Curtis v. Wet Solutions, Inc.*, 98-789 (La.App. 3 Cir. 12/9/98); 722 So.2d 421. Aggravation of a preexisting injury may constitute a disabling injury when, for example, the plaintiff begins to suffer new symptoms after the second workplace accident. *Howell v. Service Merchandise Co., Inc.*, 95-79 (La.App. 3 Cir. 8/9/95); 663 So.2d 96. To be compensable, the aggravation of a preexisting injury must result from an identifiable and discernable incident. *City of Eunice v. Credeur*, 99-302 (La.App. 3 Cir. 10/13/99); 746 So.2d 146, *writ granted in part, judgment vacated in part*, 99-3249 (La.1/28/00); 753 So.2d 226. Moreover, there must be a causal link between the

4

aggravation and a work related incident. As we have recently explained,

> [a] pre-existing disease or infirmity does not disqualify the claimant from receiving benefits if the workplace accident aggravated, accelerated, or combined with the disease to produce the disability for which compensation is claimed. Thus, the element of causation is satisfied if the employee's work-related accident was a *factor* in bringing about the employee's disabled status. Whether a causal relationship exists between the disability and the employment is a question of fact. The hearing officer's determination in this regard cannot be reversed unless it is manifestly erroneous based on examination of the record as a whole.

> The employee's workplace accident is presumed to have caused or aggravated her disability when she proves that: (1) before the accident, she had not manifested disabling symptoms; (2) commencing with the accident, the disabling symptoms appeared; and (3) there is medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and activation of the disabling condition. Once an employee establishes the presumption of a causal relationship, the employer must produce evidence and persuade the trier of fact that it is more probable than not that the injury was not caused by the work accident.

*Rideaux v. Franklin Nursing Home*, 95-240, p. 5 (La.App. 3 Cir. 11/22/95); 664 So.2d 750, 755, *writ denied*, 95-3093 (La.2/16/96); 667 So.2d 1058 (citations omitted). In *Rideaux*, we went on to explain that "[t]he presumption of causation may attach to a claimant who exhibited symptoms of her allegedly disabling illness in the distant past provided that she had suffered no such symptoms *immediately* prior to her workplace accident." *Id.* at 756.

This is an extremely fact intensive matter, but most of the facts are not in dispute. The dispute is primarily over the interpretation of the medical evidence.

### *Post-Accident Factual and Medical History*

After the accident occurred, Ms. Conner immediately reported it to her supervisor and was escorted to Jennings Hospital's emergency room for evaluation and treatment. The physician on duty in the emergency room diagnosed her with a strained left hamstring and instructed her to rest at home for four or five days, take

ibuprofen as needed for pain, and follow up with her regular physician in the next week.

On September 7, 2010, Ms. Conner sought treatment from Dr. Mark E. Clawson, a Jennings, Louisiana family practitioner, who concluded that she had probably torn her left hamstring in the accident. He prescribed muscle relaxers and anti-inflammatory medications and released her to return to work two days later, but only if she could do so without lifting, straining, or pulling. Otherwise, Dr. Clawson instructed her to remain off work until her next appointment with him. Jennings Hospital attempted to accommodate Ms. Conner by moving her to medical record duty, and she continued in that position until Dr. Clawson restricted her from performing any type of work in October of 2010.

When Dr. Clawson saw Ms. Conner on September 14, 2010, he began her on a physical therapy program and continued her modified work status. She received physical therapy treatment at the Therapy Center in Jennings, Louisiana, on twenty occasions through December 23, 2010. In the discharge summary of that date, the physical therapist asserted that Ms. Conner exhibited a forty-percent functional impairment upon discharge, and that the physical therapy goals had not been met.

Even before Ms. Conner completed her series of physical therapy treatments, Dr. Clawson ordered an MRI of her left knee and thigh. The MRI revealed no abnormality in the left thigh, but did reveal the presence of a small to moderate joint effusion associated with a tear of the posterior horn of the medial meniscus. Based on this test result, Dr. Clawson referred Ms. Connor to Dr. Holland.

On November 12, 2010, Dr. Holland performed an arthroscopy to repair the torn meniscus, but when Ms. Conner's knee continued to deteriorate, he changed his diagnosis to that of degenerative joint disease with progression. On January 31,

2011, Dr. Holland recommended a left total knee replacement, but Bridgefield Insurance initially refused to approve the procedure. Instead, it referred the request to Dr. Robert Holladay IV, a Louisiana board-certified orthopedic surgeon, for a peer review evaluation. On February 25, 2011, Dr. Holladay rejected the requested procedure, concluding that the knee replacement was not medically necessary and that the knee injury was not causally connected to Ms. Conner's September 4, 2010 work-related accident. However, Dr. Holland resubmitted his request for the left total knee replacement, and on April 25, 2011, Bridgewater Insurance approved it.

Dr. Holland performed the approved procedure on May 6, 2011. Initially, Ms. Conner felt much improved, and she began her second course of therapy with the Therapy Center on May 12, 2011. At that time, the physical therapist noted that she ambulated slowly and cautiously and that she displayed a lean on the right weight-bearing limb during ambulation. Over the first month of physical therapy, Ms. Conner experienced relief from the pain and swelling associated with the replacement surgery. However, on July 8, 2011, she voiced complaints to the physical therapist of increased knee pain, burning, and sensitivity subsequent to her previous day's treatment. These complaints persisted over the next three treatments, and at her last appointment with the Therapy Center, she did not receive treatment due to her complaints of chest pain, left-side head pain, and light-headedness. In the discharge report, the physical therapist indicated that Ms. Conner still suffered from a fifty-percent functional impairment and that her physical therapy goals had not been met.

One of the few areas of factual dispute concerns when Ms. Conner first complained of back and right knee pain to Dr. Holland. In her trial testimony, Ms. Conner claimed that her first complaints were made in December or January after

7

her September 4, 2010 accident,[2] and before the left total knee replacement surgery. She asserted that her right knee began hurting because it was her main weight-bearing limb during the eight month interval between her injury and her surgery. Then, after her right knee began hurting, she had to put all of her weight on her left knee. Both knee problems, according to Ms. Conner, led to her back hurting. On the other hand, Dr. Holland's records place the time closer to late summer or early Fall of 2011, after the surgery.

Regardless of when her complaints began, both Ms. Conner and Dr. Holland agree that when she did complain of back and right knee pain, Dr. Holland took the unusual step of declining to address these complaints. In fact, on September 23, 2011, Dr. Holland's office executed a letter to this effect, and Ms. Conner was forced to seek treatment elsewhere for those complaints. Dr. Holland testified that he did not recall Ms. Conner complaining of difficulties with her back and right knee before this time, and he stated that he declined to evaluate and treat her lower back complaints because he knew that "it would be a big, complicated, long, drawn-out issue." He went on to state that "[b]ecause I had seen her so many times with no complaints of the back, and now the back thing comes in. I just didn't want to complicate my world more than it already is." He acknowledged, during his deposition, that if there was pre-existing osteoarthritis in Ms. Conner's knees, she might develop arthritis in the contralateral or right knee over time. However, if that were to occur, he would not relate it back to the left knee treatment or surgery. Moreover, he stated that he found no evidence to support a finding that Ms. Conner's back complaints resulted from her left knee complaints, the treatment she received, or the alteration in her gait caused by her left knee injury.

---

[2] At that time, she had seen Dr. Young Hee Kang, a Welsh, Louisiana family practitioner, three times: September 30, 2010, December 16, 2010, and December 22, 2010. His records reflect that she only made complaints of left leg and left knee pain on those visits.

Less than one month later, on October 12, 2011, Dr. Holland saw Ms. Conner for the last time. At the time, she was complaining of "back pain with trouble walking." The day before this visit, Dr. Holland issued an opinion to Bridgefield Insurance stating that Ms. Conner could not perform a clerk position with Jennings Hospital, based on his review of the job description received by him on September 22, 2011. That same day, he responded to a questionnaire from Insurance Recovery Group concerning a Louisiana Second Injury Fund Medical Merger Opinion, by stating that Ms. Conner had pre-existing osteoarthritis in her left knee prior to her work-related accident; that the injury to her left knee merged functionally with her preexisting condition to create a substantially greater disability; and that the pre-existing osteoarthritis caused an increased likelihood that an injury would lead to an earlier total-knee arthroplasty. A little over five months later, on March 22, 2012, Dr. Holland approved a unit clerk job description provided by Jennings Hospital, concluding that Ms. Conner was at MMI and could return to work in that position.[3]

Three months after Dr. Holland stopped treating her, Ms. Conner began treatment with Dr. Blanda. In her initial visit on January 10, 2012, Ms. Conner complained of bilateral knee pain, headaches, pain in the spine from her neck to her lower back, and bilateral shoulder pain. Bridgefield Insurance rejected Dr. Blanda's request for approval to pursue the investigation of her complaints. Instead, it restricted Dr. Blanda's treatment to the left knee.

Working within the parameters set by Bridgefield Insurance, Dr. Blanda concluded that Ms. Conner had not yet reached MMI after her left total knee

---

[3] There is no copy of a job description dated March 22, 2012. However, there is a Medical Staff Memo, dated December 5, 2011, which was sent to Dr. Holland by Keith Simpson, Jennings Hospital's Chief Operating Officer, which includes a job description for a Unit Clerk, twenty to thirty hours per week.

replacement surgery and, therefore, she could not return to work. At the same time, he continued to request that he be allowed to obtain x-rays of the neck and an MRI of the cervical and lumbar spine.

When Dr. Blanda saw Ms. Conner on February 28, 2012, he noted positive neck and back spasms, a positive straight-leg raising test on the right side, and diffuse numbness in Ms. Conner's hands and feet. He repeated his recommendations for a cervical and lumbar MRI, concluded that she still was not at MMI, and continued her restrictions with regard to working.

After examining Ms. Conner on June 19, 2012, Dr. Blanda concluded that she was at MMI for her left knee, but with a fifty-percent impairment of that leg. This impairment, according to Dr. Blanda, left Ms. Conner with the capability of performing only sedentary work. He noted in his records that the recommended testing for Ms. Conner's other complaints was still being denied by Bridgefield Insurance. In conjunction with an August 21, 2012 rehabilitation conference, Dr. Blanda completed a causation-disability form wherein he repeated his conclusion that Ms. Conner was capable of only sedentary work and that her left and right knee and lower back complaints were caused or aggravated by her September 4, 2010 work accident.

At her November 29, 2012 visit, Ms. Conner complained of considerable right knee pain and of her knee giving out. Dr. Blanda attributed these complaints to osteoarthritis of the knees. On February 5, 2013, Ms. Conner complained of mild left knee pain; pain in her right knee, which was positive for effusion and crepitus; and neck and back pain. At that time, Dr. Blanda filled out a form requesting that she be allowed a temporary handicapped parking permit. When he saw her on August 6, 2013, Ms. Conner expressed a complaint of frequent burning

in her lower back, and Dr. Blanda prescribed a single-tip cane for her. Because he believed her weight was a problem with her recovery, Dr. Blanda counseled Ms. Conner on the importance of weight loss. At her February 6, 2014 visit, Ms. Conner complained that her back pain was worse and of a radicular nature. Dr. Blanda noted that his patient had medial and lateral tenderness of her left knee; negative five to seventy degrees range of motion; and marked difficulty walking. He recommended an injection to relieve the distress. During all of this evaluation and treatment process, he continued to restrict her from working.

On February 25, 2014, Dr. Blanda finally received permission from Bridgefield Insurance to evaluate Ms. Conner's right knee and lower back complaints. On March 20, 2014, she presented herself to the emergency room of the American Legion Hospital in Crowley, Louisiana, after she fell on her left shoulder because her right knee gave out. On April 15, 2014, Ms. Conner reported that incident to Dr. Blanda, informing him that her right leg gave way secondary to pain. At that visit, Ms. Conner complained of back pain radiating down into both legs, with the right leg worse than the left; and pain and swelling of her right knee. In examining Ms. Conner, Dr. Blanda noted that she had difficulty rising from a seated to a standing position, she exhibited an antalgic gait on the right, and the range of motion of her lumbar spine was markedly diminished with dysrhythm. Her straight-leg raise test was positive for back pain on the right and, to a lesser degree, on the left. Dr. Blanda further noted diffuse swelling and moderate effusion in the right knee, with reduced motion, especially on flexion. He recommended an MRI and x-rays of the lumbar spine and x-rays and injections in the right knee. The spinal x-rays revealed diffuse degenerative changes, but no

focal abnormality. The right knee x-rays revealed a moderate degree of arthritic change in all three of the knee's compartments.

Ms. Conner testified at trial that her balance feels unstable when she stands or walks too long, which led to her using a cane. She stated that, after learning of her falls, Dr. Blanda prescribed her a walker with a seat. Ms. Conner also stated that her ability to sleep is affected by her back pain, which requires her to either stretch or ice her back.

Ms. Conner testified that she has received no treatment for her back or right knee complaints from either Dr. Holland or Dr. Blanda because of Dr. Holland's and the defendants' insistence that these complaints were not work related. However, Ms. Conner testified that, before her work accident, she worked forty-hour weeks for Jennings Hospital and that she was never unsteady on her feet, never used a cane or a walker, or never had her right knee give out. She denied suffering any other injuries and accidents since her work accident, other than when her knee gave out and caused her to fall. She further stated that both Drs. Clawson and Blanda restricted her from working.

### *Pre-Accident Factual and Medical History*

Most of the medical records introduced by the defendants addressed Ms. Conner's medical history prior to the September 4, 2010 accident. Following a February of 1998 motor vehicle accident, Dr. Robert Marshall, a Jennings, Louisiana family practitioner, noted that both of Ms. Conner's knees were tender, with a slight amount of edema in the popliteal fossa of the right knee. The x-rays of both knees were normal. Dr. Marshall again treated Ms. Conner for bilateral knee pain following her May 12, 1999 work accident at ShopRite. A May 19,

1999 MRI of the right knee revealed a partial tear of the medial meniscus and a significant tear of the lateral meniscus.

In regard to this latter injury, Ms. Conner was treated by Dr. Holland, who was unable to identify a significant injury in September of 1999. A functional capacity evaluation ordered by him noted that she had a tendency to "self-limit," and that her work rehabilitation assessment revealed inconsistencies in her complaints and limitations. A January 25, 2000 EMG-nerve conduction test of Ms. Conner's right leg was normal. On March 29, 2001, Dr. Holland found no abnormality in her right knee and released her to full duty status with ShopRite. In an internal April 25, 2001 investigation memorandum, Louisiana Workers' Compensation Corporation (LWCC) indicated that Ms. Conner, who was receiving monthly SEBs based on this work injury, was released by Dr. Holland to return to work at full duty on March 29, 2001.

Other preexisting back and right knee complaints included Ms. Conner's May 9, 2001 complaint of lower back pain at a doctor's appointment; a May 27, 2008 complaint of back and right knee pain to Dr. Kang, caused by moving furniture; a March 6, 2009 diagnosis of lower back strain at the Crowley American Legion Hospital emergency room, when, as an employee there, she was pulled on by a patient and slipped; and an October 17, 2005 Jeff Davis Family Medicine record of her complaints of several weeks of bilateral knee pain and x-rays revealing osteoarthritis in both knees

Ms. Conner's employment file reveals that she was hired by Jennings Hospital on December 4, 2009. In addition to a housekeeping job description and various signed employment forms, the file included a, "Louisiana Post Offer-Of-Employment Medical Inquiry" form, in which Ms. Conner indicated that the only

preexisting condition she suffered from was arthritis in her knees. In a separate questionnaire, she indicated that she suffered from depression, was diagnosed with arthritis in her knees by Dr. Marshall in 2002, and that she suffered a work-related knee injury while working for ShopRite in 1999, for which she was off work for one year. In a December 7, 2009 employer-provided insurance enrollment form, Ms. Conner indicated that she had been diagnosed with arthritis within the last five years.

Ms. Conner's employment file further reflects that she was hired as a full-time, permanent employee for Jennings Hospital, and her first day of work was on December 9, 2009. During the nine months preceding her work accident, Ms. Conner averaged 76.80 hours per pay period.[4] The day before her accident, she worked 7.75 hours, and she worked five hours the day of her accident.

When questioned, Ms. Conner agreed that nothing was said in her accident report, Jennings Hospital's first report of injury, or the emergency room records about her twisting or injuring her back or injuring her right knee. The emergency room records indicate that her injury was caused by her twisting and falling. Although she did not recall whether she told Dr. Blanda about this injury, his records indicate that he was aware of her prior knee injury.

Ms. Conner admitted that she said nothing about her back or her right knee to Dr. Clawson, and although her back was hurting when she first saw him, Ms. Conner stated that she did not tell Dr. Holland because she thought her back pain would go away. She testified that her right knee complaints began while she was undergoing physical therapy for her left knee and that she reported her pain to the therapist.

---

[4] Jennings Hospital paid its employees every two weeks.

14

Ms. Conner testified that prior to her September 4, 2010 accident, she experienced bilateral knee pain following her 1998 car accident and as a result of her prior work accident at ShopRite; and although Dr. Blanda's records indicate that she related no previous neck, back, or left-knee injuries prior to September 4, 2010, Ms. Conner, when shown the medical records, recalled both instances of lower back pain. She further testified that her upper back was adjusted several times in February or March of 2010, by her brother, a chiropractor, to address the symptoms she developed from moving the heavy linen carts required by her housekeeping duties. While she could not recall whether she told Dr. Blanda about these incidents, Ms. Conner stated that nothing prevented her from carrying out her job duties prior to her work accident.

### Action of the WCJ

In her April 6, 2015 written reasons, the WCJ made the following findings of fact:

1. The undisputed facts are that the claimant, Bonnie Conner[,] sustained an accident during the course and scope of her employment with Jennings American Legion Hospital on September 4, 2010.

2. Claimant's compensation rate is $204.83.

3. Following the accident, Ms. Conner was treated at Jennings American Legion Hospital and by Dr. Clawson.

4. Dr. Clawson referred the claimant to Dr. Michael Holland, an Orthopaedic Surgeon[,] who performed an arthroscopic surgery on the claimant's left knee in November of 2010.

5. Dr. [Holland] performed a total knee replace[ment] on May of 2011 [sic] of claimant's left knee.

6. Dr. [Holland] did not address claimant's right knee and her low back.

15

7. Claimant sought treatment from her choice of doctor, Dr. Blanda, who evaluated the claimant's low back and right knee complaints in January of 2012.

8. The defendants denied treatment of claimant's back and right knee. Defendant argues there is no causal connection between the work accident and the low back and right knee complaints.

9. Dr. Holland did not evaluate claimant's back or right knee.

10. Dr. Blanda opined that the claimant's low back and right knee are related to the work accident due to her altered gait.

11. The claimant has been released to sedentary work.

12. The claimant has had prior back and knee complaints.

Based on the above findings of fact, the WCJ made the following findings:

The third circuit court of appeals [sic] has previously held that "[a] claimant's recovery under Louisiana's workers' compensation laws is not barred by a pre-existing condition because an employer takes the employee as he finds him. *Rivers v. Bo Ezernack Hauling Contractor, Inc.*, 09-991, p. 4 (La.App. 3 Cir. 3/10/10), 32 So.3d 1091, 1095, *writ denied*, 10-807 (La. 6/4/10), 38 So.3d 309. Ms. [Conner's] previous back and knee complaints do not prohibit her from receiving benefits when that condition was worsened by an otherwise compensable work related accident. *Id. See also*, *Fontenot v. Wal-Mart Stores, Inc.*, 03-1570 (La.App. 3 Cir. 4/7/07), 870 So.2d 540, *writ denied*, 04-1131 (La. 6/25/04), 876 So.2d 843; *Bourgeois* [*v. Seabright Ins. Co.*, 12-834 (La.App. 5 Cir. 4/10/13)], 115 So.3d 50. In this case, the defendant only approved treatment of the left knee. Claimant's complaints of back pain and right knee pain were not addressed by Dr. Holland. Ultimately, Dr. Blanda's evaluation concluded compensability. The request for an [i]ndependent medical evaluation is not necessary since there is no real dispute between the medical examiners. Dr. Holland did not evaluate, nor did he address low back and right knee complaints.

(First alteration in original.)

Given the record before us, we find no error in the WCJ's determination that Ms. Conner's September 4, 2010 work accident either caused or aggravated a preexisting condition, such as the osteoarthritis in her right knee, to cause her workers' compensation claims relative to her lower back and right knee. The evidence is clear that prior to her accident, Ms. Conner was performing her job

16

duties with Jennings Hospital and was working a full schedule. Even Dr. Holland acknowledged that Ms. Conner was fully employed and capable of performing her job duties.

There is no dispute that commencing with her accident, Ms. Conner began experiencing disabling symptoms. These symptoms were initially in her left knee, and Jennings Hospital has not contested this injury. Additionally, although Ms. Conner admitted that her first complaints involving her right knee and lower back did not occur until three to four months after the accident, that failure, in and of itself, does not preclude her from receiving workers' compensation benefits. In *J.P. Morgan Chase v. Louis*, 44,309, p. 6 (La.App. 2 Cir. 5/13/09), 12 So.3d 440, 445, the court stated that "[l]ong delays may be excused when the claimant does not initially appreciate the severity of her injury."

Furthermore, Dr. Blanda's medical records indicate that there is a reasonable possibility of a causal connection between Ms. Conner's work accident and the aggravation or acceleration of her osteoarthritis, which led to her right knee injury. His records further indicate that both the left and right knee injuries resulted in her altered gait, which was the possible cause of her lower back issues.

Although Dr. Holland found no correlation between Ms. Conner's right knee and back complaints and her work accident, left knee injury, or treatment, he refused to treat these complaints. However, in addressing her left knee injury, he admitted that Ms. Conner had preexisting osteoarthritis in her left knee and that this condition commonly attacks both knees. He further admitted that while undergoing left-knee treatment, Ms. Conner could develop arthritis in her right knee over time if osteoarthritis was present in that knee. Dr. Holland further opined that the existence of osteoarthritis, increased the likelihood of Ms. Conner

17

injuring her knee and requiring earlier treatment than if the condition had not existed.

Applying these principles to the facts surrounding Ms. Conner's right knee, we find no error in the WCJ's determination that Ms. Conner's right knee complaints were caused by the September 4, 2010 work accident or resulted from the aggravation, acceleration, or combination of the accident with her preexisting osteoarthritis. We also find no error in the WCJ's finding that Ms. Conner's lower back pain resulted from her changed gait, which was caused by her left and right knee issues. Although the defendants introduced evidence that Ms. Conner experienced prior issues with both knees and her lower back, she was fully capable of performing her job duties prior to her accident. Based on these findings, the WCJ's judgment on the issues of causation and compensation are affirmed.

### ASSIGNMENTS OF ERROR NUMBER TWO AND THREE

In their remaining assignments of error, the defendants argue that the WCJ abused her discretion by awarding excessive attorney fees and costs to Ms. Conner. They further argue that they were denied the opportunity to cross examine Ms. Conner's counsel on a statement introduced into evidence, which broke down the time expended and the expenses incurred by counsel in pursuing Ms. Conner's claim. The defendants claim that this statement was not in the form of an affidavit and that the WCJ's reliance on it was not reasonable and was clearly an abuse of discretion.

The defendants further point to *Weldon v. Holiday Inn-Jennings*, 11-203 (La.App. 3 Cir. 10/5/11), 76 So.3d 115, *writ denied*, 11-2463 (La. 1/20/12), 78 So.3d 144, in which a separate panel of this court decreased an employee's award of attorney fees by the amount of time spent on unsuccessful or non-contested

issues. Finally, they argue that Ms. Conner's counsel has collected attorney fees on a regular basis in this matter and that the award of attorney fees would, in effect, allow counsel to collect attorney fees twice.

The statement by Ms. Conner's counsel indicates that she worked 131 hours in the pursuit of this claim and lists her contingent hourly fee as $175.00 per hour. The $22,925.00 in attorney fees awarded to Ms. Conner equals the 131 hours multiplied by the contingent hourly rate.

In *Arretteig v. Our Lady of the Lake Hospital, Inc.*, 13-1603, pp. 15-16 (La.App. 1 Cir. 3/21/14), 142 So.3d 1048, 1057, the court discussed the intent behind attorney-fee awards in workers' compensation matters:

> Pursuant to LSA-R.S. 23:1201(F), the failure to provide payment of indemnity or medical benefits in accordance with LSA-R.S. 23:1201 or the failure to consent to the employee's request to select a treating physician or change physicians when such consent is required **shall result** in the assessment of a penalty "together with reasonable attorney fees for each disputed claim." Although the primary consideration in the *imposition* of attorney's fees is not to compensate the employee, but rather to discourage certain offensive behaviors on the part of the employer or insurer, the *amount* so awarded is intended to *fully compensate* the employee's attorney, thereby benefitting the employee, for the attorney's services rendered in connection with the litigation. *Langley v. Petro Star Corp. of La*, 2001-0198 (La.6/29/01), 792 So.2d 721, 726-727. Factors to be considered when fixing the amount of attorney's fees to be awarded include the degree of skill and ability exercised by the attorney, the amount of the claim, the amount recovered by the employee, and the amount of time the attorney devoted to the [c]ase. *Davis v. Farm Fresh Food Supplier*, 2003-1381 (La.App. 1st Cir.5/14/04), 879 So.2d 215, 221. On review, the amount of attorney's fees awarded by the workers' compensation judge will not be disturbed absent an abuse of discretion. *See Langley*, 792 So.2d at 727.

In *McCarroll v. Airport Shuttle, Inc.*, 00-1123, pp. 9-10 (La. 11/28/00), 773 So.2d 694, 700 (footnote omitted) (emphasis added), the supreme court held that an award of statutory attorney fees is intended to fully reimburse the employee for all amounts expended in their claim:

19

In our determination of the respective rights of the employee and the attorney to the statutory attorney fees, a persuasive factor is the methodology used to calculate the amount of the statutory attorney fees. The only limitation on the amount is the reasonableness of the fee awarded by the judge. *Cain* [*v. Employers Cas. Co.*, 236 La. 1085, 110 So.2d 108 (1959)]. The amount awarded rests within the discretion of the workers' compensation judge, as long as that amount is supported by the record. Some of the factors taken into account by the judge in fixing the amount of the fee are the degree of skill and ability exercised by the attorney, the amount of the claim, the amount recovered for the employee, and the amount of time the attorney devoted to the case. [14] H. Alston Johnson, III, [Louisiana Civil Law Treatise: Workers' Compensation Law and Practice] § 389 [(3rd ed.1994)]. *The amount awarded is intended to provide full recovery, without statutory limitation, for attorney's services and expenses in connection with the litigation.* If the attorney were allowed to collect the contractual attorney fees in addition to the full compensation awarded in the statutory attorney fees, the attorney would get double recovery (to the extent of the limited contractual fee) for his services, at the expense of his client.

We therefore conclude that the statutory attorney fees, awarded to the employee in cases of arbitrary behavior of the employer or the insurer, were intended to benefit the employee, who would otherwise have to pay the contractual attorney fees out of his or her benefits recovered in the litigation, and were not intended to provide additional fees to the employee's attorney, who received the amount of the statutory attorney fees as full compensation for legal services in the litigation.

Based on the supreme court's holding in *McCarroll*, this court in *Magbee v. Federal Express*, 12-77 (La.App. 3 Cir. 12/12/12), 105 So.3d 1048, held that the WCJ erred in awarding statutory attorney fees based only on those issues for which penalties were awarded.

Based on the foregoing, we find no merit in the defendants' argument that Ms. Conner is only entitled to attorney fees for work performed by her counsel in obtaining penalties on the mileage reimbursement issue. We further find no merit in their argument that they were denied the right to cross examine Ms. Conner's counsel on the contents of the statement. In determining the amount of an attorney fee award, a trial court has the discretion to set the amount based upon its own

knowledge, the evidence, and its observation of the case and the record. *Custom-Bilt Cabinet & Supply, Inc. v. Quality Built Cabinets, Inc.*, 32,441 (La.App. 2 Cir. 12/8/99), 748 So.2d 594. Nor is it necessary for the trial court to hear or consider evidence regarding the time spent or rate charged in order to make an award since the record will reflect much of the services rendered. *Burford v. Burford*, 95-2318 (La.App. 1 Cir. 6/28/96), 677 So.2d 722. Thus, the WCJ was not required to hear testimony from either party in determining the appropriate amount to award in attorney fees.

Finally, we find no merit in the defendants' argument that Ms. Conner's counsel will be paid twice if she collects this attorney fee. As stated in *McCarroll*, the award of statutory attorney fees benefits the employee and does not provide the employee's attorney with additional attorney fees.

Accordingly, we find no abuse of discretion in the WCJ's award of $22,925.00 in attorney fees to Ms. Conner. However, we do find error in the amount awarded as expenses. The list of expenses contained in the statement included amounts for telephone calls, photocopies, postage, travel, court costs, and a conference with Dr. Blanda. It also included amounts spent in obtaining the records of Dr. Blanda, the Therapy Center, and Jennings American Legion Hospital.

Louisiana Revised Statute 23:1317(B) provides, in part, "Costs may be awarded by the workers' compensation judge, in his discretion, and when so awarded the same may be allowed, taxed, and collected as in other civil proceedings." With regard to those costs which may be taxed as court costs, La.R.S. 13:4533 provides that "[t]he costs of the clerk, sheriff, witness' fees, costs

21

of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs."

Based on our review of the statement, we find that the WCJ erred in awarding Ms. Conner the costs expended by her counsel for telephone calls, photocopies, postage, travel, and for the conference with Dr. Blanda. Accordingly, the WCJ's judgment is amended to decrease the amount of expenses awarded to Ms. Conner from $2,247.25 to $419.26 to exclude those amounts.

**ANSWER TO APPEAL**

In her answer to the defendants' appeal, Ms. Conner argues that the WCJ erred by failing to award her legal interest on all amounts awarded by the judgment. She further requests additional attorney fees for the work her counsel performed on appeal.

Pursuant to La.R.S. 23:1201.3(A), any amount of compensation awarded by the WCJ bears judicial interest from the date it is due until satisfied. However, because awards for penalties and attorney fees are not considered compensation, judicial interest is only awarded on these amounts if such interest is prayed for. *Smith v. Quarles Drilling Co.*, 04-179 (La. 10/29/04), 885 So.2d 562; La.Code Civ.P. art. 1921.

In this instance, although Ms. Conner did not specifically pray for an award of judicial interest on any amount awarded as penalties or attorney fees, she did pray for judicial interest on all amounts due. Thus, we find that the WCJ erred by not awarding judicial interest on the amounts awarded as penalties and attorney fees, and the judgment will be amended accordingly.

In the final issue before us, Ms. Conner requests that we award her additional attorney fees for the work performed by her counsel in defending this

appeal. Considering that she has been generally successful in the defense of her judgment on appeal, we award her an additional $5,000.00 in attorney fees.

## DISPOSITION

For the foregoing reasons, we amend the judgment of the workers' compensation judge to decrease the expenses awarded to Ms. Conner from $2,247.25 to $419.26, and to include the award of judicial interest on the penalty and attorney fee awards; and affirm the judgment as amended. We further render judgment to award Ms. Conner an additional $5,000.00 in attorney fees for work performed by her counsel on appeal. We assess all costs of this to Jennings American Legion Hospital and Bridgefield Casualty Insurance Company.

**AFFIRMED AS AMENDED AND RENDERED.**