# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-94

MARIA EBARB

VERSUS

BOISE CASCADE COMPANY

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT 02
PARISH OF RAPIDES, NO. 14-02843
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

### JIMMIE C. PETERS
### JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED AND RENDERED.**

**GREMILLION, J., concurs in part and dissents in part, and assigns written reasons.**

**Charles W. Farr**
**1966 N. Highway 190, Suite B**
**Covington, LA 70433**
**(985) 626-3812**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Boise Cascade Company**

**George A. Flournoy**
**Flournoy & Doggett**
**P. O. Box 1270**
**Alexandria, LA 71309-1270**
**(318) 487-9858**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Maria Ebarb**

**PETERS, J.**

In this workers' compensation matter, the defendant, Boise Cascade Company, appeals a judgment denying its La.R.S. 23:1208 fraud defense and awarding indemnity benefits, medical treatment, penalties, and attorney fees to the plaintiff, Maria Ebarb. Ms. Ebarb answered the appeal seeking an award of attorney fees for work performed on appeal. For the following reasons, we affirm the underlying judgment in all respects and award additional attorney fees to Ms. Ebarb.

## DISCUSSION OF THE RECORD

Boise Cascade Company (Boise Cascade) operates a timber processing facility in Florien, Louisiana. At the time of the accident giving rise to this litigation, Ms. Ebarb was employed at that facility as a log yard utility hand.[1] Her duties included placing and maintaining sprinklers on log piles; maintaining the pumps used to circulate water from the ponds to the sprinklers; loading bark and chip trucks, cleaning the yard, and empting bins with a front-end loader; cutting and pulling pipe over the log piles; lifting tools, parts, and pipe; and climbing the approximately forty-foot-high wet log piles with the assistance of spikes attached to her boots. In other words, her employment position was of a very physical nature.

On March 26, 2012, Ms. Ebarb worked the 7:00 a.m. to 3:00 p.m. shift, and early in that shift she drove a front-end loader over a hidden four-inch-thick piece of concrete.[2] Initially, she experienced no pain from the jolt caused by the tires

---

[1] At the time of her accident, Ms. Ebarb was one month and two days shy of her forty-sixth birthday (April 28, 2012). She had worked for Boise Cascade for approximately sixteen years.

[2] The concrete block was not visible to Ms. Ebarb because it had been placed over a hole in the yard and was covered by bark from the plant operation.

rolling over the concrete, but approximately one hour later she experienced severe pain as she attempted to climb down from the front-end loader.[3] After reporting the accident to her supervisor and after having it noted in a written accident report, Ms. Ebarb finished her shift. Several days later, Ms. Ebarb woke up to severe pain that prevented her from going to work. When she reported this situation to her supervisor she was instructed to seek medical attention from Dr. Jack Corley, a Many, Louisiana family medical physician and Boise Cascade's company physician.

Ms. Ebarb first saw Dr. Corley on March 28, 2012. On that day, the doctor noted a decreased range of motion in her lumbar spine, numbness in her hip, and pain radiating down her right leg. A straight-leg-raising test produced a positive finding for pain at thirty degrees on the right side and at eighty degrees on the left. Based on his findings, Dr. Corley concluded that Ms. Ebarb suffered a lumbar strain with sciatica on the right side. Based on this finding he restricted Ms. Ebarb from returning to work for one week.

On April 4, 2012, Dr. Corley ordered an MRI of the lumbar spine. The MRI, performed on April 9, 2012, indicated the presence of degenerative disc disease in the lumbar spine. Based on his findings and the results of that test, he recommended physical therapy. When Ms. Ebarb did not respond well to physical therapy, the doctor referred her to Dr. Pierce D. Nunley, a Shreveport, Louisiana orthopedic surgeon specializing in spinal surgery.

A week after the accident Ms. Ebarb returned to work as instructed by Dr. Corley. At that time, Boise Cascade moved her to a sedentary position in the scale house; and one month later, sent her home because it no longer needed her in that

---

[3] The tires on the front-end loader are approximately five feet tall, and access to the cab of the piece of equipment is by ladder.

position. On May 7, 2012, Boise Cascade commenced paying Ms. Ebarb weekly indemnity benefits. The payment of these benefits continued until August 29, 2014, when Boise Cascade suspended payment.

Dr. Nunley first saw Ms. Ebarb on June 22, 2012. Based on his findings that day, he initially concluded that she suffered from low back pain with a herniated nucleus pulposus at L4-5, and probable lower extremity lumbar radiculopathy. In reviewing the April 9, 2012 MRI, he concluded that the degenerative disc disease reflected by that test predated the March 26, 2012 accident, but further concluded that the work accident had caused an aggravation or exacerbation of that preexisting condition. Dr. Nunley recommended that Ms. Ebarb undergo EMG/nerve conduction studies, bilateral L5 selective nerve root blocks, and continued physical therapy. Boise Cascade rejected this recommendation based on a July 6, 2012 peer review assessment which asserted that further treatment was not medically necessary. Subsequent requests for approval were denied by Boise Cascade in August and early December of 2012. Finally, on December 29, 2012, and after Ms. Ebarb requested that Dr. Nunley proceed with his recommendations through her personal health insurance, Boise Cascade reversed its position and authorized the test and treatment.

On January 30, 2013, Ms. Ebarb underwent both the EMG/nerve conduction studies and the nerve root blocks at L5 as recommended by Dr. Nunley. The studies proved negative for evidence of radiculopathy, neuropathy, and myopathy in both legs, but the nerve root blocks at L5 reduced Ms. Ebarb's symptoms in her legs by at least fifty percent. Given the relief provided, Dr. Nunley recommended a repeat of the bilateral L5 selective nerve root blocks, which Boise Cascade refused to authorize.

Months later, on November 12, 2013, Boise Cascade obtained a second medical opinion (SMO) from Dr. Douglas Bernard, a New Iberia, Louisiana orthopedic surgeon. Ms. Ebarb provided Dr. Bernard with an accident history consistent with her previous assertions, but asserted for the first time that her neck had also been hurting since her accident. Although Ms. Ebarb denied having any neck problems prior to her March 26, 2012 accident, Dr. Bernard had access to cervical x-rays taken on October 22, 2010, and a cervical MRI of December 6, 2011, both of which indicated that she suffered from preexisting degenerative disc disease in her cervical spine.

According to Dr. Bernard, Ms. Ebarb denied any prior lower back problems as well. However, he interpreted the April 9, 2012 MRI to reflect degenerative disc disease at L4-5, which had taken years to develop. He disagreed with Dr. Nunley's conclusion that the accident caused an aggravation or exacerbation of that preexisting condition. He categorized the injury as minor, and concluded that Ms. Ebarb had suffered a minor back strain in the March 26, 2012 accident, and that she was long past the point of maximum medical improvement (MMI). He found no justification for continued treatment and opined that she could return to work without restrictions.

On March 19, 2014, after undergoing the repeat of the bilateral L5 selective nerve root blocks,[4] Ms. Ebarb reported to Dr. Nunley's office that the back pain had become worse, particularly after sitting and standing for long periods of time. An April 4, 2014 MRI revealed a broad-based bulging disc at L4-5, with mild to moderate subfacet stenosis and moderate facet hypertrophy, and producing neural

---

[4] The record is unclear as to whether the second set of nerve root blocks and the subsequent April 4, 2012 lumbar MRI were authorized by Boise Cascade or paid for by Ms. Ebarb's own health insurance.

4

foraminal and subarticular stenosis. Based on this finding, Dr. Nunley informed Ms. Ebarb on April 4, 2014, that her choices were to (1) learn to live with the pain, (2) undergo a third set of injections, or (3) undergo a bilateral microscopic lumbar decompression at L4-5. He described the surgery as a thirty-minute outpatient procedure which would provide more room for the nerve root, but would not require the insertion of instrumentation or hardware. When she returned to see Dr. Nunley on May 12, 2014, Ms. Ebarb informed the doctor that she wanted to undergo a third set of nerve root injections before making a final decision on the issue of surgery.

At this same May 12, 2014 appointment, Ms. Ebarb complained to Dr. Nunley of neck and upper extremity pain, which she associated with the accident. This was the first time she mentioned a neck injury to Dr. Nunley, and in voicing this complaint, she reported to Dr. Nunley that she recently had been diagnosed with this neck injury by physicians at LSU University Health-Shreveport in Shreveport, Louisiana.

Between the April 4, 2014 and May 12, 2014 appointments Ms. Ebarb filed a disputed claim for compensation against Boise Cascade, asserting her work-related accident as the basis for her claim. In her April 30, 2014 claim, she specifically asserted that her March 26, 2012 work-related accident caused an injury to both her neck and back, and that she was seeking to recover benefits, interest, penalties, and attorney fees based on the accident and the events thereafter. However, before trial, her counsel of record withdrew any claim for a neck injury arising from the accident.

In its May 8, 2014 response, Boise Cascade admitted that Ms. Ebarb suffered a work-related injury to her lower back, but denied any injury to her neck.

5

Boise Cascade further asserted that in either case, Ms. Ebarb was not entitled to any further workers' compensation benefits; nor was she entitled to penalties or attorney fees. Two days before filing its response, Boise Cascade notified the Office of Workers' Compensation that it had terminated Ms. Ebarb's employment with the company, based on a clause in a company/employee labor agreement that allowed such action when an employee is absent from work for a period in excess of two years.

Thereafter, the workers' compensation judge (WCJ) granted Boise Cascade permission to obtain an independent medical examination (IME) of Ms. Ebarb. Dr. Robert E. Holladay, IV, a Shreveport, Louisiana orthopedic surgeon, performed the IME on August 18, 2014. On that date Ms. Ebarb provided him with a consistent accident history, but complained of both back and neck pain. Although Ms. Ebarb did not attribute her neck and upper extremities pain to the March 26, 2012 accident, Dr. Holladay recognized immediately that she suffered from deficits in her upper extremities. She had marked weakness in her right arm, could not rotate her hand, had difficulty in extending her wrist, and had atrophy in the first web space between the thumb and index finder. Similar weaknesses were clearly present in her left side extremities as well. He observed that a December 6, 2011 cervical MRI revealed moderately protruding discs at C5-6 and particularly C6-7, with degenerative changes at both levels, including a narrowing of the disc space. Based on the probable progression of these changes, Dr. Holladay was not surprised to find Ms. Ebarb's current myelopathy problems

With regard to Ms. Ebarb's lower back complaints, Dr. Holladay noted that the findings of the April 9, 2012 lumbar MRI did reveal degenerative changes at L4-5. These changes included a narrowing of the disc space with loss of hydration

6

and minimal bulging secondary to the degenerative changes. He also noted mild degenerative changes at L2-3 and L3-4. He found little change in the lumbar spine in the April 4, 2014 MRI.

Dr. Holladay was of the opinion that the findings of the April 9, 2012 MRI predated the March 26, 2012 accident; and the medical records provided to him indicated that Ms. Ebarb made complaints of back pain in 2006, 2010, and 2011. Although she provided no history of prior lower back problems, none of her diagnostic tests suggested that she suffered a new injury or structural change as a result of her work accident, which would have aggravated the preexisting degenerative disc disease in her lower back. Dr. Holladay agreed with Dr. Bernard that at the most, Ms. Ebarb suffered a strain or a sprain of the lumbar spine in her work accident; that she was at MMI; and that she could return to work without restrictions.

Dr. Holladay actually expressed more concern about Ms. Ebarb's cervical condition than her lumbar complaints. He concluded, based on the medical records before him, that that she suffered from a possible myelopathy or pressure on the spinal cord. After Boise Cascade obtained Dr. Holladay's report, it sent the August 29, 2014 notice of suspension of compensation and medical benefits.

On June 5, 2015, and after completion of some discovery in the litigation, Boise Cascade amended its answer to assert a La.R.S. 23:1208 fraud defense based on false statements Ms. Ebarb allegedly made in her deposition and to Dr. Bernard concerning preexisting problems she experienced in her back and neck. Boise Cascade asserted that these statements were willfully made for the purpose of obtaining workers' compensation benefits, and therefore, Ms. Ebarb had forfeited her right to receive these benefits. Boise Cascade also sought restitution of all

7

benefits paid.

This matter proceeded to a trial on the merits on July 22, 2015. At trial, Ms. Ebarb described her current symptoms as a burning sensation extending from the middle of her back into her right side; a throbbing pain in her right leg; and numbness in both leg, from her knees down. She testified that her toes in both feet will curl under and spasm, sometimes even when she walks. Housework and yard work is now difficult or impossible as she cannot stay on her feet for long periods of time; and she cannot squat or climb. She tosses and turns at night and often has to sleep in a recliner. Given her current condition, she testified that she could not perform the duties of a log yard utility hand. Specifically, she could not climb the wet log piles; access the cab of the front-end loader; or maintain the sprinkler system or the water pumps.

With regard to her initial claim for benefits based on a neck injury, she testified that she thought she had suffered a neck injury in the accident because of the worsening stinging and burning in her neck and the loss of strength in her arms. However, she confirmed the prior actions of her attorney in abandoning that portion of the claim as not being supported by the evidence. With regard to her lower back claims, she asserted that she had not experienced any previous injuries to her lower back that prevented her from carrying out her employment with Boise Cascade.

When questioned about some notations in her prior medical records concerning cervical and lumbar complaints, Ms. Ebarb could not recall the specifics of every medical evaluation, but generally declined to argue with the accuracy of the various notations. However, she specifically disputed others, claiming that her treatment was for matters other than cervical or lumbar problems.

8

When asked if her testimony denying prior back problems was untruthful, the following exchange took place between her and Boise Cascade's counsel:

A: That's what it sounds like, but I did heavy lifting and so my back just hurt me some here and there. But throughout the years my memory's not good.

Q: The truth is that you had problems with your back before the March 2012 accident at Boise. Isn't that the truth?

A: No, my back never hurt me none.

Q: When you saw Dr. Bernard down in New Iberia in November 2013, did you tell him that you had never had problems with your back and neck before?

A: Yes.

Q: Okay. Was that a truthful statement to him?

A: Yes it was.

Q: Okay. In light of all these records, you still maintain that what you told Dr. Bernard when you said you'd never had prior problems with your back and neck that you were telling him the truth?

A: Yeah, I felt like I was.

Q: When you saw Dr. Holiday [sic] up in Shreveport, did you tell him that you had never had problems with your back and neck?

A: Dr. Holiday [sic]?

Q: He's the IME physician that you saw in Shreveport.

A: I don't remember.

Q: Ms. Ebarb, isn't it true now that you're attempting to take advantage of the situation by getting Boise to pay for problems you've been having for many, many, many years before this accident? Isn't that the truth?

A: No, it's not.

Later in her testimony, Ms. Ebarb asserted that she had been a faithful employee and that she never missed work regardless of any problems she experienced with

her neck, arms, or wrists prior to her work accident. Dr. Nunley noted in his testimony that Ms. Ebarb appeared motivated to work through her medical problems and return to work as soon as possible, as did Dr. Holladay.

In addition to the testimony of Ms. Ebarb and Drs. Nunley, Bernard, and Holladay, Boise Cascade provided the WCJ with medical records of numerous providers that treated Ms. Ebarb prior and subsequent to her accident. These medical records, Boise Cascade argues, clearly establish that Ms. Ebarb suffered from both lumbar and cervical problems before the March 26, 2012 accident.

At the conclusion of the evidentiary phase of the trial, the WCJ took the matter under advisement and, on October 13, 2015, issued an oral ruling denying Boise Cascade's La.R.S. 23:1208 fraud defense and awarding Ms. Ebarb temporary total disability benefits (TTD) from September 2, 2014 forward; TTD benefits for May 4-6, 2014; medical treatment with Dr. Nunley; reimbursement of $316.20 in mileage; $8,000.00 in penalties; $15,000.00 in attorney fees; and court costs. The WCJ denied Ms. Ebarb's claim for supplemental earning benefits (SEB) for the month of April 2012. On October 20, 2015, the WCJ executed a written judgment corresponding to its oral reasons for judgment, and thereafter, Boise Cascade perfected this appeal. In its appeal, Boise Cascade raises four assignments of error:

> 1. When a claimant willfully makes false statements about pre-existing conditions, and she asserts a claim for benefits for those same conditions, it is error for the workers' compensation judge to dismiss the employer's defense pursuant to R.S. 23:1208.

> 2. When a claimant makes false statements about conditions she knew pre-existed her accident, and withdraws her claim only after it is revealed through discovery that the condition pre-existed the work accident, it is error for the workers' compensation judge to find the statements to be inadvertent and inconsequential and dismiss the employer's defense pursuant to R.S. 23:1208.

3. The Office of Workers' Compensation Hearing Rule 6007 requires that trial issues be listed in the pre-trial statement. R.S. 23:1203.1 sets forth the procedure to be followed by a health care provider seeking approval of medical treatment. When the denial of treatment was not listed as an issue by claimant in her pre-trial statement, and when claimant failed to prove that the procedures outlined in R.S. 23:1203.1 were followed, it is error for the workers' compensation judge to award penalties and attorney's fees for the employer's failure to approve medical treatment, i.e. injections and EMG/nerve conduction velocity study.

4. The Office of Workers' Compensation Hearing Rule 6007 requires that the trial issues be listed in the pre-trial statement. R.S. 23:1203(D) provides that an employee is entitled to mileage expenses when [s]he uses her own vehicle for transportation. When the failure to pay mileage was not listed as an issue by claimant in her pre-trial statement, and when claimant's only proof is a list of dates and miles traveled with no evidence that she used her own vehicle for transportation, it is error for the workers' compensation judge to award penalties and attorney's fees for the employer's failure to pay mileage expenses.

As previously stated, Ms. Ebarb answered the appeal seeking additional attorney fees for work performed on appeal.[5]

**OPINION**

*Assignment of Error Numbers One and Two – La.R.S. 23:1208 Fraud Assertions*

Boise Cascade's first two assignments of error question the correctness of the WCJ's denial of its La.R.S. 23:1208 fraud defense based on false statements made by Ms. Ebarb relative to her preexisting lower back and neck problems. It further argues that the WCJ erred in finding that Ms. Ebarb's statements were inadvertent and inconsequential. We will address these two assignments together.

Pursuant to La.R.S. 23:1208(A), "It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false

---

[5] Ms. Ebarb initially raised two issues in her answer to appeal. However, she noted in her appellate brief that she was waiving her request for an award of SEBs for the month of April 2012.

statement or representation." If proven, a finding of fraud results in the forfeiture of workers' compensation benefits by the offending person and can result in the imposition of criminal penalties, civil penalties, and the restitution of all paid benefits. La.R.S. 23:1208(C), (D), and (E).

In order to prevail on a fraud defense, the party alleging fraud must prove three elements: (1) that a false statement or representation, (2) was willfully made, and (3) was made for the purpose of obtaining or defeating any benefit or payment. *Resweber v. Haroil Constr. Co.*, 94-2708, 94-3138 (La. 9/5/95), 660 So.2d 7. The employer need not prove that it suffered prejudice as a result of the false statement or misrepresentation. *Freeman v. J.P. Morgan Chase*, 42,716 (La.App. 2 Cir. 12/5/07), 974 So.2d 25. As stated in *Resweber*, 660 So.2d at 16, "where the false statements are made specifically to obtain benefits, and thus to defraud the workers' compensation system, the benefits will be forfeited for the sole reason that the claimant has willfully and deliberately attempted to defraud the workers' compensation system, and no further requirements are to be imposed."

Furthermore, because the forfeiture imposed by La.R.S. 23:1208 is severe in nature, the provisions of the statute must be strictly construed. *Freeman*, 974 So.2d 25.

> The word "willful" has been defined as "proceeding from a conscious motion of the will; voluntary; knowingly; deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary." *Grant v. Natchitoches Manor Nursing Home*, 96-1546 (La.App. 3rd Cir.5/14/97), 696 So.2d 73, 76, *writ denied*, 97-1582 (La.10/17/97), 701 So.2d 1330. The relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits. A false statement which is inconsequential to the present claim may indicate that the statement was not willfully made for the purpose of obtaining benefits. Clearly, an inadvertent and inconsequential false statement would not result in forfeiture of benefits. *Resweber v. Haroil Constr. Co.*, 660 So.2d at 16.

12

*Newman v. Richard Price Constr.*, 02-995, p. 5 (La.App. 1 Cir. 8/8/03), 859 So.2d 136, 141.

On appeal we review a WCJ's factual findings pursuant to the manifest error standard of review. *Bourque v. Transit Mix/Trinity Indus.*, 13-1390 (La.App. 3 Cir. 4/1/15), 162 So.3d 690. Whether a violation of La.R.S. 23:1208 has occurred is a finding of fact which will not be reversed absent manifest error. *Rogel v. Dollar Gen. Corp.*, 13-792 (La.App. 3 Cir. 12/11/13), 132 So.3d 978, *writ denied*, 14-58 (La. 3/14/14), 135 So.3d 604.

Initially the fraud assertions by Boise Cascade related to Ms. Ebarb's denial of prior neck and back problems in her discovery deposition, as well as the statements she made to Dr. Bernard concerning her prior medical history.[6] Dr. Bernard's records indicate that Ms. Ebarb informed him that her neck had hurt since the March 26, 2012 accident, and that she did not have a history of preexisting back or neck problems. The pre-accident and post-accident medical records offered by Boise Cascade to show a history of lumbar and cervical problems include the records of Dr. Gregory P. Founds, a physician at the Family Medical-Surgical Center in Many, Louisiana, who treated Ms. Ebarb in mid-2006, and five years later in December of 2011; the Natchitoches Parish Hospital in Natchitoches, Louisiana, dated February 26, 2008; the Sabine Medical Center, Rural Health Clinics #1 and #2, where she was treated in 2010, 2011, 2013, and 2014; the McGraw Chiropractic Clinic in Many, Louisiana, where she was treated on June 30, 2011 and July 5, 7, 2011; Dr. J. Eric Bicknell, a Shreveport, Louisiana physical medicine, rehabilitation, and electrodiagnostic medicine physician, who saw Ms. Ebarb on October 18, 2011, and December 9, 2014 (over two years after the accident); Dr. Michelle Ritter, a Shreveport, Louisiana orthopedic surgeon,

---

[6]At this point, she had yet to see Dr. Holladay.

who saw Ms. Ebarb on May 23, 2012; Dr. Shawn Granger, a Shreveport, Louisiana orthopedic surgeon, who saw Ms. Ebarb on May 23, 2012; Dr. Larry K. Broadwell, a Shreveport, Louisiana rheumatology and osteoporosis physician, who saw Ms. Ebarb on August 9, 2012; and LSU University Health-Shreveport, where she was treated on April 18-21, 2014, and on May 25, June 5, and August 18, 2014.

Without question, these medical records refer to neck and back problems, but standing alone, do not identify the specific nature, degree, or origin of these problems. The WCJ recognized this in denying Boise Cascade's fraud defense, and stated the following in its oral ruling:

> With respect to any claim of Ms. Ebarb about a neck injury occurring in March of 2012, there's nothing contained in any physician's records, until Ms. Ebarb saw Dr. Bernard on November 13, 2013, where she had complained either to Dr. Corley or Dr. Nunley about any neck injury.

> There's no information I can find in this record after looking thoroughly this morning, that Ms. Ebarb had ever made a claim during this time period with Boise Cascade for medical care associated with any neck injury or the payment of any medical expenses associated with examination or testing associated with a neck injury.

> One of the things the employer points to, to support this misrepresentation, is that when she saw Dr. Bernard on 11/12/13, she was talking about neck complaints on that occasion, and Dr. Bernard noted she didn't give him a history of any prior problems in the past.

> I reviewed very thoroughly all of the past medical records of Ms. Ebarb from the Sabine Medical Centers, the Sabine Medical Center Rural Health, Clinic No. 1; the Sabine Medical Center Rural Health Clinic No. 2; the Chiropractic Clinic; records from Dr. Bicknell; Dr. Michelle Ritter from the Center for Hand Surgery; the medical records of Rheumatology and Osteoporosis Specialists.

> With regard to any previous neck issues, her presentations to any of those health care personnel, indicated that she was not only having trouble with her hands, trigger problems with her thumb, memory issues and headaches.

> There was a lot of referral amongst these physicians trying to find out what was the source for all of these complaints Ms. Ebarb was presenting with. As a result of all of this, the way I read these

records, is she was finally referred to Dr. Ritter and Dr. Bicknell, to determine what the conditions were with her hands. They seemed to indicate that she had some type of arthritic problem with her hands and suggested surgery for her hands.

There's some written complaints in the chiropractic record from Dr. McGraw about low back issues and numbness and problems with her hands and some moderate complaints of cervical discomfort. She only saw the chiropractor on three occasions, in late June and early July of 2011.

I find this case, particularly with regards to the assertions that Ms. Ebarb made misrepresentations to Dr. Bernard on 11/12/2013, to be much like the case of Colonial Nursing Home vs. Bradford, 02-588 Louisiana Third Circuit decision December 30, 2002, 834 So.2d 1262, writ denied 03-364, April 21, 2003, 841 So.2d 802.

What I find in comparison with Ms. Ebarb's case and Ms. Bradford's case was, at the time these alleged misrepresentations that the employers contended occurred, with respect to a compensation claim, the Court found that the alleged misrepresentations by Liddia Bradford didn't occur with respect and regard to Ms. Bradford having made any type of claim at all for any injuries in any alleged incident.

And the record's clear that through November of 2013, that Ms. Ebarb had never made a claim against Boise Cascade for any neck complaints; it wasn't, apparently, until the 1008 was filed in May of 2014. Nevertheless, the Court finds that any statement or denial of previous medical care, there's certainly no medical evidence of any previous cervical injury sustained in any type of accident that Ms. Ebarb may have had in the past.

There's a lot of confusion between the physicians, as I read the records, as to what is actually going on with her neck complaints, her headache complaints, her memory issues, her hand issues, her trigger finger issues.

I don't think that Ms. Ebarb, a layperson with a high school education just working in the labor industry had any way of ascertaining clearly that there was a proper diagnosis that she had had, in fact, these cervical issues that needed to be addressed, because they were not addressed during this course of time. The focus was on her hands and her arthritis.

I read very thoroughly the deposition of Ms. Ebarb; [re]viewed my notes and notations that I made during the course of the trial about my assessment of Ms. Ebarb's credibility. I find that there was no - - that any statements denying about [sic] past medical care, were inconsequential and inadvertent.

15

Turning to the previous back issues, there were less previous issues regarding the back, then there were associated with any neck complaints. The most significant, I guess, would be her visits to the chiropractor, which was only three occasions, in late June and early July of 2011. There's really no indication that she was ever restricted because of these complaints.

When I reviewed thoroughly the depositions of Dr. Bernard, Dr. [Holladay] and Dr. Nunley, I really cannot understand how this employer ever had Ms. Ebarb seen by Dr. Bernard since Dr. Nunley was, in fact, their chosen specialist. Nevertheless, it did occur.

But all - - Dr. Nunley's conclusions were that Ms. Ebarb has nerve impingement problems at L-5. Dr. [Holladay] didn't find these to be problematic. His one-time examination performed in August of 2014, indicates that, "Well, I don't find anything objective; this is all subjective." But he did agree that the incident described with the 950 could have, at least, caused a lumbar strain or sprain. Dr. Bernard had the same conclusion, although he found nothing wrong in the long-run with Ms. Ebarb. He felt like she could return to her full-duty work.

Nevertheless, she remained in the care of Dr. Nunley, who was, in fact, the employer's choice of specialist. His records reflect objective findings associated with the L-5 radiculopathy screening of Ms. Ebarb. This was ongoing through May of 2014, just shortly prior to Dr. [Holladay's] independent examination.

In the reply briefs filed on Ms. Ebarb's behalf, it was directly pointed out to the Court, that workers with pre-existing conditions can be covered by workers' compensation, because the employer takes his employee as they find them. The abnormally susceptible workers[sic] is entitled to workers' compensation benefits if they can show a work accident aggravated the previous condition. Dr. Nunley's deposition testimony as well as the medical records indicates such.

When Drs. Nunley, [Holladay] and Bernard, were questioned about these previous problems, they indicated they were - - it doesn't appear to this Court that they were ever given any of these past medical records to review. Dr. Nunley, in his deposition, clarified his view of some previous medical records, where they show back complaints as being disassociated with the particular complaints he saw in this individual on his day of examination.

It's true that none of these previous issues were very serious; didn't require much treatment, if any, just some testing. None of them disabled Ms. Ebarb from performing her work duties at Boise Cascade.

As pointed out in the reply briefs, that's been relied upon on numerous occasions by this Court, the case of Hutchinson vs.

Aldworth Company, a Fourth Circuit decision from 2004, 888 So.2d Page 1052, indicated than when, even though past medical conditions are shown to physicians, if the physicians don't change their opinions about causation, this doesn't amount to the type of misrepresentation that's anything more than inadvertent and inconsequential.

All physicians in this case indicated that the accident, at the very least, caused an aggravation or a sprained strain [sic]. No one offered an opinion, that said, "Based on this past information, we conclude that there was no causation, at all, from the incident with regard to any complaint Ms. Ebarb may have about her low back problems."

Accordingly, the Court finds that the employer has failed to prove, considering the harsh nature of the penalty under 23:1208, that Ms. Ebarb is guilty of making willful misrepresentations for the purposes of obtaining workers' compensation benefits.

Based on our review of the record, we find that it was not manifestly erroneous for the WCJ to find that Ms. Ebarb's statements denying that she suffered from preexisting lower back and neck problems, were false. The issue then becomes whether her false statements were willfully made for the purpose of obtaining workers' compensation benefits or payments.

The WCJ denied Boise Cascade's fraud defense as it related to Ms. Ebarb's denial of prior neck complaints, finding that her statements were inconsequential and inadvertent based on the confusion surrounding her upper extremity issues, Ms. Ebarb's degree of understanding, and the WCJ's finding regarding her credibility. As noted by the WCJ, the first time that Ms. Ebarb mentioned the possibility of a work-related neck injury was during Dr. Bernard's examination. This was an examination that Boise Cascade was not entitled to because, as pointed out by the WCJ, Dr. Nunley was its choice of orthopedic surgeon, even if Ms. Ebarb consented to his treatment. Moreover, at that time, Ms. Ebarb had not yet filed a disputed claim for compensation and was still unrepresented by counsel. Although she was receiving indemnity benefits and medical treatment at the time,

17

she never sought medical treatment for her purported neck injury. Even after she obtained counsel and filed a disputed claim for compensation on April 30, 2014, she still sought no medical treatment for her neck, and soon thereafter, she abandoned any claim associated with her neck problems. Based on the foregoing, we find that the record supports a finding that it was reasonable for the WCJ to find that Ms. Ebarb's statements denying her prior neck problems, were inadvertent or inconsequential to her present claim for workers' compensation benefits.

We further find no manifest error in the WCJ's denial of Boise Cascade's fraud defense in relation to Ms. Ebarb's denial of previous lower back complaints. The record reveals in relation to both her neck and lower back conditions that this is a lady with a complicated medical history. Although she complained of back pain as far back as 2006, that episode was in conjunction with what Dr. Founds described as a sudden acute onset of postpartum arthritis or a viral related arthralgia or myalgia. Dr. Founds examination of Ms. Ebarb's back revealed "some asymmetry of the back and scoliosis views reveal[ed] some mild low thoracic upper lumbar scoliosis with some associated rotoscoliosis." It was in conjunction with this episode that two short-term disability forms were submitted on Ms. Ebarb's behalf by Dr. Founds.

Ms. Ebarb's only other direct complaint of back pain occurred in 2011, when she said she sought treatment because her pelvis was out of alignment. During both her trial and her deposition testimony she admitted that she sought treatment from the chiropractor only once. Her two indirect mentions of back pain occurred on October 18, 2011, and on February 22, 2012. In the first instance Dr. Bicknell, who performed an EMG/nerve conduction studies, noted that she

complained of low back pain. The second instance was to Dr. Ritter, a hand surgeon, who merely noted that Ms. Ebarb related that she had experienced back pain within the past five years.

Based on the foregoing, it was reasonable for the WCJ to find that Ms. Ebarb's statements denying that she suffered lower back complaints prior to her work accident were either inadvertent or inconsequential in regard to her present claim. The incident in 2006 was directly related to her condition following the delivery of her baby. Moreover, the scoliosis revealed by the x-rays involved her lower thoracic and upper lumbar spines. Thus, that finding is inconsequential to her lower lumbar complaints. Ms. Ebarb further admitted that she sought chiropractic treatment, and we find that the close proximity of the lumbosacral joint to the pelvis could lead to her own misdiagnosis of her problem. Finally, as the last two incidents did not occur in direct relation to a request by her for treatment it was reasonable for the WCJ to find that her failure to relate them was inconsequential to her current claim.

Moreover, as pointed out by the WCJ, all of the physicians found that Ms. Ebarb suffered at least a sprain or a strain of her lower back as a result of her March 26, 2012 work-related accident. Dr. Nunley admitted that while he would consider any prior medical records in reaching an opinion on causation, he denied that he would automatically change his opinion if presented with medical records evidencing she had prior lower back complaints. However, there is nothing in the record to establish that Boise Cascade presented such records to Dr. Nunley and requested that he reconsider his causation opinion. Accordingly, we find no manifest error in the WCJ's denial of Boise Cascade's La.R.S. 23:1208 fraud defense as it relates to Ms. Ebarb's lower back claim.

19

Based on the foregoing, the WCJ's judgment denying Boise Cascade's La.R.S. 23:1208 defense is affirmed; and Boise Cascade's first two assignments of error are dismissed for being without merit.

***Assignments of Error Numbers Three and Four - Penalties and Attorney Fees***

In its last two assignments of error, Boise Cascade argues that the WCJ erred in awarding penalties and attorney fees to Ms. Ebarb based on its failure to approve Dr. Nunley's requests for the EMG/nerve conduction studies and the L5 selective nerve root blocks and its failure to timely reimburse her medical mileage.

In both assignments, Boise Cascade argues that Ms. Ebarb's pretrial statement failed to specify these as issues to be decided at trial. This, it claims, was a violation of the Office of Workers' Compensation hearing rule 40 La.Admin Code Pt. I, § 6007, which provides that a pretrial statement shall include: (1) stipulations agreed to by all parties; (2) issues to be litigated; (3) contentions; (4) a list and brief description of all exhibits to be offered at trial; (5) a list of all witnesses to be called at trial; and (6) desirability of mediation. The issues listed in Ms. Ebarb's pretrial statement were as follows:

1. AWW

2. Nature and extent of disability

3. Causation

4. Entitlement to indemnity benefits and medical treatment for work-related injuries

5. Penalties and attorney fees

Louisiana Revised Statutes 23:1317(A) provides that "[t]he workers' compensation judge shall not be bound by technical rules of evidence or procedure" and "shall decide the merits of the controversy as equitably, summarily, and simply as may be." In dismissing Boise Cascade's argument, the WCJ noted

20

and evidently found that "[e]ntitlement to indemnity benefits and medical treatment for work-related injuries[,]" was broad enough to include the issues relating to Boise Cascade's failure to approve medical treatment and reimburse mileage. We agree.

In reviewing the record, we note that Ms. Ebarb specifically listed Boise Cascade's failure to furnish or authorize medical treatment and its nonpayment or untimely payment of medical- and travel-related expenses as bona-fide disputes in her disputed claim. We further note that Boise Cascade specifically denied these claims in its answer. Additionally, the pretrial statements of both parties indicated that one of the issues to be decided at trial was whether Ms. Ebarb was entitled to penalties and attorney fees. Finally, Boise Cascade failed to object when Ms. Ebarb introduced evidence at the trial relative to these two issues. Accordingly, we affirm the WCJ's ruling that these two issues were properly before him on the merits. *See Maricle v. Sunbelt Builders, Inc.*, 05-398 (La.App. 3 Cir. 11/2/05), 916 So.2d 1226, *writ denied*, 05-2506 (La. 3/31/06), 925 So.2d 1261.

We further find no error in the WCJ's findings on the merits of these issues. Boise Cascade argues that the WCJ erred in awarding penalties and attorney fees based on its failure to authorize the treatment recommended by Dr. Nunley, because no evidence established that he complied with La.R.S. 23:1203.1(J), by submitting his treatment requests to Boise Cascade's third-party administrator, Sedgwick CMS, via a Form 1010, or by appealing the denial of these requests to the Office of Workers' Compensation's Medical Director via a Form 1009. It further argues that it was error for the WCJ to award penalties and attorney fees based on the mileage claim, because the only evidence offered by Ms. Ebarb on this issue was a travel log containing dates and round trip mileage.

21

With regard to the medical treatment issue, Boise Cascade was bound by its choice of Dr. Nunley as its orthopedic surgeon, even if it disagreed with his recommendations. *Greer v. Whole Foods Mkt., Inc.*, 13-455 (La.App. 4 Cir. 1/15/14), 133 So.3d 80, *writ denied*, 14-258 (La. 4/4/14), 135 So.3d 1184. Accordingly, it was not entitled to the SMO performed by Dr. Bernard and could not rely on his opinion in order to create a dispute as to Ms. Ebarb's condition. *Id.* However, since Ms. Ebarb failed to object to the IME by Dr. Holladay, his opinion was admissible. *Vanderberg v. Atl. Se. Airlines*, 02-383 (La.App. 3 Cir. 11/13/02), 831 So.2d 1067. Thus, the first valid knowledge Boise Cascade had to contest Dr. Nunley's opinion was after Dr. Holladay rendered his IME opinion on August 18, 2014.

The evidence reveals that Dr. Nunley's first request for treatment was denied by Sedgwick on July 26, 2012, but was later approved on December 29, 2012. His request for the second round of L5 nerve root block injections was made after Ms. Ebarb's May 22, 2013 appointment, but was not approved until after her January 16, 2014 appointment. The failure to provide medical treatment equates to a failure to provide medical benefits pursuant to La.R.S. 23:1201(E), which requires the payment of medical benefits within sixty days after written notice is received by the employer. *Romero v. Garan's, Inc.*, 13-482 (La.App. 3 Cir. 8/6/14), 145 So.3d 1120. In this instance, Boise Cascade failed to authorize Dr. Nunley's treatment until well outside the sixty-day period, but well before it received Dr. Holladay's IME opinion. Accordingly, we find no error in the WCJ's award of penalties and attorney fees on this issue.

With regard to the mileage issue, Ms. Ebarb introduced a copy of a certified letter received by Boise Cascade on June 2, 2014, which requested payment for her

mileage in the amount of $316.20. Enclosed in the letter was a Workers' Compensation - Mileage Claim form, which listed ten entries for trips Ms. Ebarb made from her home to Dr. Nunley's office, which the form indicates is sixty miles round trip. The dates listed on the form correspond to Ms. Ebarb's appointments with Dr. Nunley on June 22, 2012, August 13, 2012, September 25, 2012, May 22, 2013, January 16, 2014, March 19, 2014, April 14, 2014, and May 21, 2014, as well as April 4, 2014, the day of her lumbar MRI. Boise Cascade argues that because Ms. Ebarb failed to testify in support of this issue, a strict construction of La.R.S. 23:1203(D) requires that her claim be dismissed.

> Pursuant to La. R.S. 23:1203(D) an employer is responsible for the mileage expenses that are reasonably and necessarily incurred in order to obtain medicines and medical services. "However, a claimant must present evidence of such expenses." *Smith v. Roy O. Martin Lumber Co.*, 03-1441, p. 10 (La.App. 3 Cir. 4/14/04), 871 So.2d 661, 669, *writ denied*, 04-1311 (La.9/24/04), 882 So.2d 1144. Evidence of such expenses include the actual cost of the trip or the number of miles traveled. *Lang-Parker v. Unisys Corp.*, 00-880 (La.App. 1 Cir. 10/5/01), 809 So.2d 441.

*Johnson v. Conagra Poultry Co.*, 09-646, p. 5 (La.App. 3 Cir. 12/9/09), 26 So.3d 982, 986, *writ denied*, 10-350 (La. 4/16/10), 31 So.3d 1067.

Considering the evidence presented by Ms. Ebarb, which contained the number of miles she traveled for each appointment with Dr. Nunley, we find that she presented sufficient evidence to substantiate her claim. Furthermore, Boise Cascade received notice of Ms. Ebarb's request for reimbursement on June 2, 2014, and it had no knowledge or information with which to controvert her claim until August 18, 2014. Thus, we find that it was reasonable for the WCJ to find that Boise Cascade failed to reasonably controvert Ms. Ebarb's claim; and we affirm the WCJ's award of penalties and attorney fees pursuant to La.R.S. 23:1201(D).

23

**ANSWER TO APPEAL**

In her answer to appeal, Ms. Ebarb requests that we award her additional attorney fees for work performed by her counsel in defending this appeal. Considering the successful nature of her defense, we award her an additional $5,000.00 in attorney fees.

**DISPOSITION**

For the forgoing reasons we affirm the judgment of the workers' compensation judge in all respects. We further render judgment to award Ms. Ebarb an additional $5,000.00 in attorney fees for work performed by her counsel on appeal. We assess all costs of this appeal to Boise Cascade Company.

**AFFIRMED AND RENDERED.**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT


16-94


MARIA EBARB

VERSUS

BOISE CASCADE


**Gremillion, J., concurring in part and dissenting in part.**

Plaintiff was injured in a work-related accident. Over the course of time, she claimed, at various times, that the accident caused injuries to her back, legs, neck, arms, and hands.

Two doctors opined that the most significant problem this accident caused her was a minor back strain and/or sprain. Two other doctors, however, testified that the injuries resulting from this accident were much more serious. They reported, again, over time, that she would need a significant amount of treatment and possibly even surgery.

The WCJ found that the testimony suggesting a much more serious injury to be the stronger evidence, and thus gave the plaintiff everything she asked for. The majority goes through an entirely appropriate manifest error review, and affirms the WCJ's decision. I concur in that part of the majority's ruling.

I must dissent, however, because I do believe the defendant reasonably controverted the claims made against it. La.R.S. 23:1201(F)(2). Again, the defense produced evidence from two doctors who said there was nothing to see here. Even more compelling, the defendant produced evidence that the plaintiff

repeatedly denied on more than a dozen occasions her own history of previous neck and back injuries.

In the majority's view, these repeated falsehoods are to be excused as mere examples of a poor memory, a limited education, or a general lack of understanding. All of that may be so; however, it may also be that the plaintiff lied repeatedly in order to obtain benefits. The majority also finds that this menagerie of inconsistencies is "inadvertent or inconsequential." Again, this may be; however, it may also be that over a dozen lies bearing directly on the alleged injuries for which the plaintiff would receive benefits could have some consequence.

Frankly, it strains the bounds of the manifest error review to choose not to punish this plaintiff for her multitude of inaccuracies. Here, however, not only does the majority not punish the plaintiff for these inaccuracies, but indeed, the majority punishes the defendant for the plaintiff's inaccuracies. More specifically, the majority has concluded that a defendant is unreasonable when it seeks to defend itself at trial on the basis of multiple expert witnesses and clear evidence that the plaintiff is not a credible witness. I disagree. The defendant was entirely reasonable. If the evidence presented by the defendant does not reasonably controvert such a claim, then I truly do not know what evidence could. Accordingly, it should not have been assessed penalties and attorney fees.

Finally, again, based on the manifest error standard of review, I concur with the additional attorney's fees for work done on appeal.